[L. A. No. 23697.   In Bank.   May 22, 1956.]

BENEFICIAL FIRE AND CASUALTY INSURANCE COMPANY (a Corporation), Respondent, v. KURT HITKE AND COMPANY, INC. (a Corporation), Appellant.

John S. Bolton and F. V. Lopardo for Appellant.

Hill & Attias, Henry Attias, Philip Glusker and Frank Mankiewicz for Respondent.

CARTER, J.—Plaintiff, an insurance company, obtained a favorable declaration of its rights under a written agency contract in its action against defendant agent.

The contract was made in February, 1950, and according to its terms and as found by the court, plaintiff appointed defendant its general agent to solicit and obtain purchasers of insurance policies of a certain type in a specified area, the policies to be issued in plaintiff's name as insurer. Generally the insurance to be sold was for property damage and public liability in connection with a certain class of motor vehicles. The contract was to remain in force until 30 days after written notice of cancellation was given by either party. As far as appears, the contract has not been cancelled by either party.

The action, for declaratory relief, was commenced by plaintiff in October, 1952, and apparently the contract had been carried out by the parties for at least two years prior thereto.

The contract provided that defendant would keep records of business transacted for plaintiff and send monthly "all dailies on business written." (Par. 2.) All monies of plaintiff and all premiums collected by defendant on policies issued were to be paid to plaintiff as provided in the contract. (Par. 3.) Any credit for premiums extended to insureds

by defendant was to be at its risk and the premiums on such policies were to be paid by defendant to plaintiff not later than 60 days after the end of the calendar month in which the policy was written. (Pars. 4 and 6.) Plaintiff could reject any risk submitted and defendant was not to be entitled to any commission thereon. (Par. 7.) Plaintiff was not to be "responsible" for any of defendant's expenses in conducting the agency. (Par. 9.) Defendant was to provide inspection and safety service, investigate losses claimed to be payable under policies and cooperate with plaintiff in settlement of losses. (Par. 13.) Paragraph 14 deals with defendant's compensation as follows: "On or before the 30th day of each month, the Company [plaintiff] will compute all premiums earned during the previous month and will furnish the General Agent [defendant] with a statement thereof, together with a record of all losses and loss expense paid and of all reserves for loss incurred on a case basis. At such time the Company *shall remit* to the General Agent all *commission earned* during said previous month. In the event the *computation of commission earned at the end of any regular monthly adjustment period results in a deficit against the General Agent, this deficit shall be fully covered by a subsequent commission earning before any earned commission shall be due the General Agent.*" (Emphasis added.) Paragraph 15 provides that defendant agreed to accept as compensation in full for its services and plaintiff agreed to pay compensation to be determined as follows: "From the gross earned premium under all policies of insurance . . . there shall be deducted the following items: (a) losses and allocated loss adjustment expense; (b) a fixed charge by the Company of a sum equal to 20% of such gross earned premium; (c) from the residue remaining shall be paid a sum as commission to the General Agent not to exceed 30% of the gross earned premium." Loss adjustment expense is defined as the "allocated" overhead cost of defendant in the adjustment of each claim and is subject to review and in the event of dispute it shall be settled by arbitration. The last sentence of that paragraph provided: "As soon after December 31 of each calendar year as practicable, the underwriting profits arising out of the net retained business under this contract shall be computed and 50% thereof shall be payable to the General Agent. That retained business shall be defined as the net amount of risk assumed by the Company after deducting quota share reinsurance." If the parties could not

agree on the "reserves for the outstanding losses and loss adjustment expense," arbitration was provided for and the decision "shall be used for the reserve in the computation of the compensation and underwriting profits provided for in Paragraph 14 until subsequent developments occur which may change the extent of liability." (Par. 16.) Defendant could appoint agents for plaintiff. (Par. 17.) The agreement was to remain in force until cancelled as heretofore mentioned and such cancellation was to apply to all provisions in the contract except those items which pertain to the compensation of the General Agent, which items were to remain in full force and effect until all premiums had been earned and losses had been paid, or until an earlier mutually agreeable date had been set. "With respect to *those items the Company agrees to pay the General Agent any and all amounts due the General Agent and the General Agent agrees to pay the Company any and all amounts due the Company.*" (Emphasis added; par. 19.)

The trial court determined that defendant's compensation was to be determined under paragraph 15 of the contract; that paragraph 14 provided for "interim monthly payments to defendant on *account* only"; that under paragraph 19 the final determination of the compensation was to be fixed after all premiums had been earned (that is, after the term of the policies written had expired) and all losses had been paid, and that defendant's compensation was contingent in that whether defendant received any compensation at all depended upon a favorable loss experience under the policies written which could not be determined until all losses had been paid and loss adjustment expenses had been paid and premiums earned. That as a result, prior to cancellation of the contract, any overpayment made to defendant under paragraph 14 might be recovered by plaintiff only out of commissions later earned and payable to defendant but that after cancellation of the contract defendant must repay to plaintiff any portion of the sums received under paragraph 14 which exceeded the amount necessary to pay losses and the other items mentioned in paragraph 15. In other words, the trial court decided that while the contract was still in effect defendant could keep the commissions paid to it monthly under paragraph 14 and would not be personally liable to return them to plaintiff, but if they were too much, as shown by later events, any overpayment could be deducted from the monthly

commissions payable, but at the end of the contract, defendant would be personally liable for any deficiency which could then be deducted from commissions found to be still payable in the final accounting. The monthly payments were treated like advances on commissions for which defendant would be ultimately liable if they exceeded the commissions in fact earned, that is, in effect, that defendant agent alone bore the risk of whether it would be paid anything for its services or for the expense of operating the agency business.

Defendant contends that none of the commissions paid to it monthly under paragraph 14 are returnable to plaintiff and that if the contract is not unequivocally subject to that construction, evidence offered by it to explain the contract and indicating such construction should have been admitted. Plaintiff, of course, contends the trial court's construction was correct and there was no ambiguity in the contract.

■ Defendant offered to prove: (1) That the parties construed the contract during the time it was being carried out as urged by defendant and to that end plaintiff's vice president would testify, as he had by deposition, that the sums paid monthly to defendant were fully earned and not returnable at any time and that plaintiff had never demanded a return of those sums although they showed in a deficit position; (2) that under trade custom and usage in the insurance business with respect to general agency contracts, in which both parties were engaged, earned commissions are never returnable. The trial court rejected the offer. While the offer of proof is general and somewhat vague it is sufficient. The trial court had previously indicated that it would receive no extrinsic evidence of any kind bearing upon the construction of the contract. ■ Where an entire class of evidence has been declared inadmissible or the trial court has clearly intimated it will receive no evidence of a particular class or upon a particular issue, an offer of proof is not a prerequisite to raising the question on appeal, and an offer, if made, may be broad and general. (*Heimann* v. *City of Los Angeles,* 30 Cal.2d 746 [185 P.2d 597] ; *Lawless* v. *Calaway,* 24 Cal.2d 81 [147 P.2d 604] ; *Caminetti* v. *Pacific Mut. Life Ins. Co.,* 23 Cal.2d 94 [142 P.2d 741] ; *Estate of Kearns,* 36 Cal.2d 531 [225 P.2d 218].) As said in the Kearns case: ''At the hearing on the petition for instructions the trial judge stated that the will was not ambiguous and that he did not wish to hear any extrinsic evidence. Accordingly, no witnesses were called, but a statement was made

of the proof which appellants could produce if permitted to do so. Respondent asserts that some of the evidence which appellants state they could produce is not relevant and that some is incompetent under section 105 of the Probate Code. We need not, however, discuss in detail the different items of proof because it is apparent from the record that respondent objected to the admission of any extrinsic evidence and that it was the purpose of the court to exclude all such evidence. Although the statement made by appellants did not amount to a formal offer of proof, none was necessary since the trial court had declared the will was unambiguous and had clearly intimated that no extrinsic evidence would be received.'' (P. 537.)

■ Extrinsic evidence should have been admitted. The contract was ambiguous. (With regard to the trade usage, ambiguity is not necessary; this is later discussed.) The contract could mean that the sums paid defendant monthly were not returnable except possibly out of commissions earned in the future either before or after cancellation. Paragraph 14, *supra*, provides that plaintiff was to compute the premiums earned during the previous month and give defendant a statement thereof *together* with a record of all losses and loss expense and all reserves. At *that* time, plaintiff, and presumably on the basis of those records, was to pay to defendant all commission shown to have been ''earned'' during the previous month. If from such regular monthly adjustment period there is shown a deficit against defendant, it was to be covered by subsequent or future commissions, that is, paid from them. Paragraph 15, *supra*, could mean that it dealt only with the method of computing defendant's commission or compensation and not as indicating that any earned commissions paid monthly were to be returned. Paragraph 16, *supra*, could refer only to the method of arriving at reserves in determining the commission and the subsequent developments there mentioned could refer only to a deduction from future commissions of any overpayment of commissions. Following this is paragraph 19, *supra*, which provides for cancellation but reserves, in event of cancellation, the provisions with regard to compensation, and, as to those provisions, plaintiff agrees to pay defendant and defendant to plaintiff all amounts due to the other. This could mean, as indicated by the trial court, that an accounting was to be had in which all of the monthly commission payments would be reexamined and that any difference between the parties off-

set and the balance owed by one to the other, if any, paid. It could also mean that the commissions accruing after cancellation on business transacted before cancellation were to be computed in the same way as those before and that against those commissions only would the amounts owing plaintiff be balanced.

On the question of ambiguity and the admission of extrinsic evidence, we said in *Chastain* v. *Belmont*, 43 Cal.2d 45, 51 [271 P.2d 498]: "Parol evidence is also admissible to aid in the interpretation of an ambiguous contract or writing. . . . As the court said in *California Emp. Stab. Com.* v. *Walters, supra* [64 Cal.App.2d 554 (149 P.2d 17)], '[t]*he very fact, however, that plaintiff questioned the meaning of certain words and clauses used in framing the agreement in itself shows that it was ambiguous. (Body-Steffner Co.* v. *Flotill Products,* 63 Cal.App.2d 555 [147 P.2d 84].)' " (Emphasis added.) And: "When the language used is fairly susceptible to one of two constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties . . . not to show that 'the parties meant something other *than* what they said' but to show 'what they meant *by* what they said'. . . . Where any doubt exists as to the purport of the parties' dealings as expressed in the wording of their contract, the court may look to the circumstances surrounding its execution—including the object, notice and subject matter of the agreement . . . —as well as to subsequent acts or declarations of the parties 'shedding light upon the question of their mutual intention at the time of contracting'. . . . To this latter point, it is said that 'a construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court.' (*Woodbine* v. *Van Horn*, 29 Cal.2d 95, 104 [173 P.2d 17]. . . ." (*Barham* v. *Barham*, 33 Cal.2d 416, 422 [202 P.2d 289].) " 'Once something has to be read into a contract to make it clear, it can hardly be said to be susceptible of only one interpretation. It would have been error for the trial court to read something into the contract by straining "to find a clear meaning in an ambiguous document, and having done so exclude the extrinsic evidence on the ground that as so construed no ambiguity exists." ' (*Union Oil Co.* v. *Union Sugar Co.*, 31 Cal.2d 300, 306 [188 P.2d

470].) It is apparent that the lease, as amended, is not clear on its face, and, under the theory of the parol evidence rule that has been accepted by the majority of this court, evidence of the negotiations of the parties and of surrounding circumstances was admissible for the purpose of determining the meaning of its provisions." (*Decter* v. *Stevenson Properties, Inc.*, 39 Cal.2d 407, 416 [247 P.2d 11].) ■ The rules are stated in *Walsh* v. *Walsh*, 18 Cal.2d 439, 443 [116 P.2d 62] : "When a contract is in any of its terms or provisions ambiguous or uncertain, 'it is primarily the duty of the trial court to construe it *after a full opportunity afforded all the parties in the case to produce evidence of the facts, circumstances and conditions surrounding its execution and the conduct of the parties relative thereto.*' (*Barlow* v. *Frink*, 171 Cal. 165, 172 [152 P. 290].) [Italics added.] The governing principle as to when parol testimony may be introduced to explain the language of a contract or to ascertain the intention of the parties is clearly set forth in *Kenney* v. *Los Feliz Investment Co., Ltd.*, 121 Cal.App. 378, 386, 387 [9 P.2d 225], as follows: 'It is a settled rule that when the language employed is fairly susceptible of either one of two constructions contended for without doing violence to its usual and ordinary import an ambiguity arises where extrinsic evidence may be resorted to for the purpose of explaining the intention of the parties, and that for this purpose conversations between and declarations of the parties during the negotiations at and before the execution of the contract may be shown (*Balfour* v. *Fresno C. & I. Co.*, 109 Cal. 221 [41 P. 876]).' "

■ In regard to trade usage it is clear that both parties were engaged in the business of issuing and selling insurance and in that connection in making arrangements for a general agent. Aside from other instances, the phrases "earned commission" and "earned premiums" alone, referred to in paragraph 14, *supra*, of the contract, may have a special meaning in that business. They may mean that such commissions are such as the agent is entitled to, and, as ascertained at the time, are not returnable in light of subsequent events. This court said in *Ermolieff* v. *R.K.O. Radio Pictures, Inc.*, 19 Cal. 2d 543, 550 [122 P.2d 3] : ". . . while words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, as the case may be, yet if in reference to the subject matter of the contract, particular expressions have by trade usage acquired a different meaning,

and both parties are engaged in that trade, the parties to the contract are deemed to have used them according to their different and peculiar sense as shown by such trade usage. Parol evidence is admissible to establish the trade usage, and that is true even though the words are in their ordinary or legal meaning entirely unambiguous, inasmuch as by reason of the usage the words are used by the parties in a different sense. (See Code of Civil Procedure, § 1861; Civil Code, §§ 1644, 1646, 1655; *Jenny Lind Co.* v. *Bower & Co.*, 11 Cal. 194; *Callahan* v. *Stanley*, 57 Cal. 476; *Higgins* v. *California Petroleum etc. Co.*, 120 Cal. 629 [52 P. 1080]; *Caro* v. *Mattei*, 39 Cal.App. 253 [178 P. 537]; Wigmore on Evidence, vol. IX, § 2463, p. 204; Restatement, Contracts, §§ 246, 248; 89 A.L.R. 1228.)'' In *Body-Steffner Co.* v. *Flotill Products, Inc.*, 63 Cal.App.2d 555 [147 P.2d 84], the court held that evidence of custom and usage was admissible to show that a contract phrased as one of sale was considered one of agency only. The court there said: ''It is a rule of practically universal acceptation in common law jurisdictions that however clear and unambiguous the words of a particular contract may appear on its face it is always open to the parties to the contract to prove that by the general and accepted usage of the trade or business in which both parties are engaged and to which the contract applies the words have acquired a meaning different from their ordinary and popular sense. (Civ. Code, § 1644; Code Civ. Proc., § 1861; Rest., Contracts, § 246(a); 2 Williston on Sales, 2d ed., § 618, p. 1556; 3 Williston on Contracts, rev. ed., § 648, pp. 1871-1872, § 650, pp. 1874-1879; 9 Wigmore on Evidence, 3d ed., § 2463, p. 204; 25 C.J.S., Customs and Usages, § 24, pp. 111-112; 17 C.J., Id., § 61, pp. 498-499; 12 Am.Jur., Contracts, § 237, pp. 762-763; note 89 A.L.R. p. 1228, et seq.)

''The rule is clearly and simply stated in the Restatement of the Law of Contracts, section 246, Comment on Clause (a) in the following language: 'The rule stated in the Clause is not confined to unfamiliar words or to words often used ambiguously. Familiar words may have different meanings in different places. A usage may show that the meaning of a written contract is different from an apparently clear meaning which the writing would otherwise bear.'

''Thus, for example, such an apparently clear expression as 'one thousand' may be shown by a trade usage to mean more than the number one thousand (*Smith* v. *Wilson*, 3 Barn. & Adol. 728, 110 Eng. Reprint 266) or less than that number

(*Soutier* v. *Kellerman*, 18 Mo. 509; *Louisiana Red Cypress Co.* v. *George Gilmore & Co.*, 13 Ga.App. 472 [79 S.E. 379]) or to be estimated in an arbitrary manner without regard to actual number (*Brunold* v. *Glasser*, 23 Misc. 285 [53 N.Y.S. 1021]; *Walker* v. *Syms*, 118 Mich. 183 [76 N.W. 320]), and the word 'white' may, by similar usage, be shown to include its antithesis black (*Mitchell* v. *Henry* (1880), L.R. 15 Ch. Div. 181). . . .

"It is true that the parties by their contract may evidence an intention not to be bound by the usage. But the mere use of language which is prima facie inconsistent with the usage cannot be held to show an intent not to be bound by the usage where the usage gives to that very language a meaning different from that which would normally be ascribed to it. . . .

"Where two parties engaged in the canned goods trade in the same locality, as here, enter into a contract they are bound by a generally accepted usage of the trade in that locality giving to the terms and language actually used in their contract a particular meaning and legal significance, even though that meaning may be at variance with the normal meaning and interpretation which would be given to that language in the absence of proof of the usage of the trade." (P. 558.)

It should be clear, therefore, that extrinsic evidence was admissible here as an aid in construing the contract. The meaning given by the parties to the contract since its existence and their performance thereunder, the preliminary negotiations and the question of whether custom and usage in the insurance business has given meaning to the terms of the contract are all relevant to the interpretation of it and should enable the trial court to ascertain the meaning of the contract. Whether all that defendant offered to prove will be relevant and admissible cannot, of course, be now determined. That will depend upon the nature and character of the proof sought to be made.

The judgment is reversed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., Spence, J., and Dooling, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.