[Civ. No. 21548. Second Dist., Div. Two. July 3, 1956.]

IRVING GOODMAN, Appellant, v. SAM JONAS et al.,
Respondents.

Morris E. Cohn and Erwin B. Morse for Appellant.

Stephens, Jones, Lafever & Smith, Maurice Jones, Jr., and Eugene W. Bell for Respondents.

FOX, J.—Plaintiff initiated an action comprising two counts: (1) for declaratory relief regarding the construction of a lease; and (2) for damages caused by defendants' fraudulent misrepresentation in inducing him to make the lease. The appeal is from those portions of the judgment which (a) construe the reciprocal rights and obligations of the parties under the lease, and (b) deny damages for fraud. Plaintiff will be subsequently referred to as Goodman and defendants[1] as Jonas.

---

[1]There are two defendants, Sam Jonas and his wife, the latter joined as one of the lessors. Since Mrs. Jonas is not alleged to have made any of the claimed misrepresentations, Jonas will be referred to in this opinion for convenience as if he were the sole defendant.

Defendant Jonas had been engaged in the manufacture of various types of furniture for about 20 years prior to 1953. In 1945, he purchased an unimproved parcel of land fronting on Beach Street to the north and Nadeau Street to the east. Jonas erected a factory building thereon and thereafter conducted his manufacturing operations at that site. During the following eight years, Jonas made periodic additions to the original structure. All building permits after the first construction were obtained by Jonas and by 1953 the factory encompassed some 40,000 feet under a single roof. The various phases of Jonas' business and manufacturing operations were arranged in departments situated in particular sections of the premises. In what is roughly the north half of the premises, the shipping department and showroom occupied the area along Beach Street. To the rear were located the cutting room, upholstery department, warehouse area, the machine room and a part of the space for storing lumber. In the balance of the premises to the south, a finishing room, and the office area occupied the rest of the portion fronting on Beach Street. To the rear was a drying room, a compressing room, the mill area, a glue room and the rest of the lumber storage area. In connection with his manufacturing process, Jonas maintained on the premises such equipment as power saws, sanders, and woodworking machinery.

In June, 1953, plaintiff Goodman began negotiations with Jonas for a lease of the premises. Goodman had been manufacturing furniture for about seven years and desired to expand his operations to include a line of bedroom and dining room sets. Goodman outlined to Jonas certain ideas he had relative to his proposed use of the premises, including the spraying of furniture with inflammable liquids. The lease negotiations consumed a period of approximately four months, in the course of which Goodman and others acting in his behalf made comprehensive inspections of the premises and Goodman's attorney, Joseph Ostrow, explored the matter of compliance with building and zoning requirements. Both parties were represented by counsel in the closing stages of their discussions regarding the lease. On October 26, 1953, a five-year lease with option to renew was executed, providing for occupancy on February 1, 1954, at a gross rental of $126,000, payable at the rate of $2,100 per month. Simultaneous with the execution of the lease, Goodman purchased

from Jonas, under a conditional sales agreement, machinery used by the latter in the manufacture of furniture for $30,000.

Subsequent to the execution of the lease, Goodman employed an engineer named Terrico to design a work flow system and to plan the arrangement of machinery and equipment. Terrico's proposed layout included the installation of spray booths for the application of paints, lacquers and varnishes, and a 150-foot heating tunnel to dry the finishes. These operations were to be conducted in the north half of the premises, largely within the area where Jonas had his upholstery department and warehouse. Jonas' finishing and drying had taken place in the southeast part of the building in an area of some 3,000 square feet. These processes under Goodman's operation would entail about four times more space, and were in the north half of the premises.

Shortly after Goodman entered under the lease and commenced manufacturing, he encountered difficulties with the authorities as he proceeded with his plans. Goodman had installed additional woodworking machinery in the mill area in the south half of the premises, thereby increasing the volume of sawdust and wood refuse which is a by-product of this operation. The Los Angeles County Department of Building and Safety (denominated ''Building Department'' herein) notified him that it would be necessary to provide the walls of the mill area with fire-protective sheeting. Goodman was further advised that in order to place spray booths and a heat tunnel in the north half, formerly devoted to upholstery, the prescribed areas containing the booths would have to be compartmentized by the installation of fire-resistive partitions and the existing walls sheeted with fireproof material. Goodman informed Jonas of this contretemps and, asserting that the lease obligated Jonas to bear the cost of these alterations, demanded that Jonas provide the required work. Jonas denied liability, but, after several months of discussions, he went ahead with the sheeting of the walls of the mill or woodworking area after notifying Goodman he would seek reimbursement of the expense incurred. This work was completed in September, 1954. However, Jonas refused to proceed with any of the work recommended for the north half.

The demised premises had a silo-type incinerator which had been installed in 1946, when no permit to operate was required. Two cyclones were attached to the incinerator, their function being to collect the sawdust and shavings and

feed them into the incinerator. At no time had Jonas been cited by the Air Pollution Control District (APCD) for incinerator emissions. After taking possession of the premises, Goodman added a third cyclone to the incinerator and modified the blower system. Shortly thereafter he was cited by the APCD for emission of excessive smoke. On May 12, 1954, Goodman's application for a permit to operate the incinerator was denied. The letter from the APCD stated that the application was denied for the following reasons:

"1. An inspection made on April 28, 1954, disclosed that the incinerator operates in violation of Section 24242 of the Health and Safety Code . . . by emitting smoke in excess of that allowed;

"2. The design of the incinerator is such that it will not operate without further periodic violations of section 24242 . . ."

An APCD engineer testified that because of its variable feed, a silo-type incinerator, even with careful operation, will periodically violate the law. Goodman demanded that Jonas modify the incinerator so that he could obtain an operating permit from the APCD. This Jonas refused to do, disclaiming liability under the lease.

It was established that the leased factory was zoned M-1 for manufacture. However, a much-mooted question during the trial and upon this appeal relates to whether the premises complied with the use category specified in the building laws of the county of Los Angeles. The building code classifies by alphebetical letter various uses of premises in accordance with the degree of fire hazard. A furniture factory is not specifically placed in any category, but the various elements of such an operation are provided for. Under the effective ordinance, Group F includes "factories or workshops using materials not highly flammable or combustible." A group E-2 classification applies to "paint shops and spray painting rooms and shops." Among the Group E-3 occupancies are listed "woodworking establishments, planing mills and box factories" and "factories where loose, combustible fibres or dust is manufactured, processed or generated." (Section 503(a) of the Los Angeles County Building Code provides in part: "When a building is used for more than one occupancy purpose each part of the building comprising a distinct 'Occupancy' . . . shall be separated from any other occupancy as specified in Section 503(d)." Section 503(c) describes various types of "occupancy separations" in terms

of hours of fire-resistive capacity. Section 503(d) reads, in part: " . . . Where any occupancy separation is required the minimum shall be a 'One-Hour Fire-Resistive Occupancy Separation.' "

As appears from the several applications for building permits made by Jonas, the entire premises, with the exception of 2,400 square feet,[2] was classified as an E occupancy by the building authorities. However, during Jonas' occupancy of the premises, the interior separating walls had no fire-resistive qualities except for a relatively small segment located in the compressing room and part of the mill area. Elsewhere, these walls were of "open stud" or exposed wood construction. Nevertheless, the record discloses that at no time during Jonas' occupancy did his use of the premises meet with disapproval from the inspecting officials and that no violations in the plant were observed or reported. Subsequent to Goodman's occupancy a newly-assigned building officer named Grant inspected the premises and gave notice that alterations would be necessary if Goodman's operations were to comply with the law. As has been indicated, Jonas and Goodman could not agree as to who should bear the expense of the required alterations.

In the action brought to resolve the controversy, Goodman's first count (for declaratory relief) alleged the execution of the lease, the fact that 80 per cent of the premises and the incinerator did not comply with the requirements of the law, that the premises were not fit for the manufacture of furniture and that the incinerator could not be used because it could not qualify for a permit. The prayer was for a declaration of rights under the lease, which was appended to the complaint. The second count alleged that Jonas was thoroughly familiar with all phases of furniture manufacturing and with Goodman's requirements in the contemplated use of the premises; that Jonas knew that the premises did not meet the requirements of law for use as a furniture factory; that despite such knowledge, and in order to induce Goodman to execute the lease, Jonas represented that the premises complied with the laws regarding the manufacture of furniture and were fit for all phases of such manufacture insofar as the Los Angeles Building Code was concerned; that appellant relied on such representations to his damage in executing the lease.

[2]This section was classified as Group F, Jonas describing its use on the building permit as "storage lumber and Metal Springs—Furniture Frames."

The crucial section of the lease obligations here in dispute is article 15, which reads: "FIFTEENTH: Lessee will, at his sole cost and expense, faithfully observe in the use of the premises all municipal, state and federal regulations, ordinances and statutes now in force or which may hereafter be in force. Lessor agrees to bear the expense of *any structural building repair or modification* which shall legally be required by any municipal, state or federal regulation, ordinance or statute, which repair or modification shall not be due to the negligence, carelessness or wrongful conduct of the Lessee or to the Lessee's using the demised premises for a purpose other than that of the manufacture of furniture and all phases thereof." (Italics added.) Other pertinent paragraphs of the lease are: "TENTH: Lessor warrants and represents that the present zoning of demised premises is designated as M-2 and M-1. In the event that said zoning designation is changed by governmental authority, to the end that Lessee will be prevented from conducting all phases of a furniture manufacturing business, Lessee shall have the option to terminate this lease, and be relieved from all obligations thereunder, and receive back from Lessor a sum equal to the monthly rental then in effect." "ELEVENTH: Lessee agrees that the demised premises are now in a tenantable and good condition and agrees to accept the demised premises in the condition and state of repair in which they now are, subject to ordinary wear and tear occurring between the date of this lease and February 1, 1954. Lessor agrees to keep in good crder, condition and repair the foundations, roof and exterior walls of the demised premises, and the structure of the interior bearing walls, except for any damage thereto caused by any act or negligence of the Lessee or his employees, agents, licensees or contractors . . ." "TWELFTH: Lessee is specifically granted the right to move or install as many spray booths as necessary for the conduct of his business, and to repair, move or install as many non-bearing partitions as may be necessary for the conduct of his business, without prior written consent of the Lessor, provided that said work is done in compliance with the laws of the city, county and state authorities. Except as hereinabove stated, Lessee will not make, or suffer to be made, any alterations of said premises, or any part thereof, without the written consent of the Lessor first had and obtained; *any additions to or alterations of the said premises, however, shall remain the property of the Lessee, even though affixed or annexed to the realty,* provided that

Lessee is not in default and shall upon removal leave the premises in substantially the same condition as at the commencement of the lease, ordinary wear and tear excepted.'' (Italics added.)

The trial of the issues posed was a lengthy one, and the findings, which are predominantly in favor of Jonas, are unusually extensive. We will epitomize those findings so far as they are germane to the questions before us. The court found that the Los Angeles County building laws do not classify furniture manufacture in either use category E or F to the exclusion of the other and that during the period Jonas conducted such manufacturing business on the demised premises and at the time the lease was executed, his use and occupancy of the premises was in full compliance with the county ordinances and at no time did anyone order him to cease and desist from using all or part of the premises; that the responsibility for making classifications to particular occupancy categories is entrusted to certain administrative officials, who have direction to permit mixed occupancy of premises without making them conform with the requirements of other categories; that under the applicable laws, existing occupancies were allowed to continue when not dangerous to life but upon any change in use or occupancy, the law required that each several occupancy within the building be separated from the other by fire-resistive walls; that while the premises did not meet the requirements for new construction, the use made by Jonas met the applicable requirements as interpreted by the building officials; that Goodman was legally entitled to conduct an operation on the same basis and to the same extent.

The court further found that at the time negotiations for the lease were undertaken, Goodman generally informed Jonas of the type of furniture he wished to make and of his proposed installation of spray booths and a heating tunnel in the north 19,000 square feet designated by Jonas as the upholstery department and warehouse; that Jonas knew that Goodman's proposed use would include cutting, planing, and milling of lumber and the spraying of furniture with inflammable fluids; that as of the date of the commencement of the lease ,the premises were fit and suitable for the manufacture of furniture; that Jonas made no warranties of fitness for any particular or specific use, except as set out in paragraph Tenth (previously quoted) of the lease, which has not been breached.

Notwithstanding the findings that the premises complied with the law, the court found that Jonas added certain roofing over a passageway covering an area 80 feet by 15 feet between the rough mill and center mill area without an antecedent permit but "in good faith"; that as a result of this construction, the two areas became a "single building" under the applicable laws, no part of which was separated from the other by two-hour fire-resistive separations; that on October 26, 1953, and on February 1, 1954, there were no two-hour fire-resistive separations within the said building, and none were required by reason of the uses theretofore made of said building, and the applicable ordinance provisions; though the same were required in case of change of kind, degree, purpose, or manner of use, or by a change of occupancy whereby existing uses were transferred to new or different areas therein; that the premises would not comply with the requirements imposed by the construction of a roof over the passageway if, in fact, full use was made of those areas to the extent that they were openly and visibly capable of being used, but that, in fact they were not being so used by Jonas and his use thereof was legal; that prior to the commencement of this action, Jonas made the walls of the mill area fire-resistant; that under the terms of the lease the cost of such modification was required to be made at Jonas' expense.

The court further found that after Goodman took over the premises, he installed a spray booth in the former upholstery department, and additional woodworking machinery in the mill area which greatly increased the production of sawdust and shavings; that he planned the installation of additional spray booths and a heat tunnel in the northern half of the building; that the use of additional equipment and the use of the proposed installations was and is a change in the character of use or occupancy under the building ordinances; that to carry out these plans and to continue such expanded use requires "installation of fire-proof sheeting on some existing walls and the construction of interior non-bearing partitions to reduce floor areas"; and that the proposed use without the installation of fire-walls and fire-proofing of existing walls is not lawful.

The court found that in order to make the north half comply with the law to permit Goodman's operation to the desired extent, it was necessary to do the following things:

"To add one-hour fire resistive partitions or separations

so as to divide said 19,000 square feet into areas not to exceed 4,375 square feet where spraying is proposed to be done; and not to exceed 8,750 square feet where woodworking involving hazardous by-products is to be done; and for this purpose, in addition to said partitions, it is reasonably necessary either that two presently existing *bearing walls* be removed and other bearing walls be placed on the premises, or that the doorways and clerestory windows *in the bearing walls* be closed or provided with proper fire doors, and that such bearing walls wherein openings are so closed be made one-hour fire resistive by the application of plaster or gypsum on both sides." (Italics added.) The court found these modifications would not "constitute structural changes" under the lease and would not be required by law except for the use of the premises proposed by Goodman.

The court found that the lessor has performed his obligations under paragraph 11 of the lease, and that his agreement therein "to keep in good order and repair . . . the structure of the interior bearing walls" was not intended by the parties to include the addition of fire-proof sheeting to such walls; that under paragraph 13, Goodman has the right to install spray booths and to move or install non-bearing partitions without Jonas' consent but such work must be done in compliance with the controlling laws and Jonas is not obligated under the lease to bear the expense thereof.

With respect to article 15, it was found that it was not the intent of the parties thereunder to obligate Jonas "to make any structural building repair or modification" made necessary under the law because of the use to which Goodman put the premises; that it was the intent of the parties and is Jonas' obligation to make and bear the expenses of any structural building repair or modification in such building in the event that the state of such structure as it was accepted by Goodman becomes illegal to maintain apart from any use made of it by Goodman.

Concerning the incinerator, the court found it was of a design not presently considered adequate by the APCD; that Jonas had at all times operated in compliance with the law; that Goodman altered the incinerator after obtaining the demised premises by adding equipment for feeding wood waste; that he thereafter operated the incinerator in violation of the law and his application for a permit to operate it was denied; that Goodman has been informed by the APCD that to obtain a permit, the incinerator would have to

be redesigned, reconstructed or replaced to its satisfaction; that Goodman was at all times familiar with the permit requirements of the APCD; that Goodman agreed to accept the premises in their then condition after full investigation, and that it was not the intention of the parties that Jonas repair, replace or modify the incinerator so that Goodman might conduct his operations on the premises.

With respect to the cause of action for fraud, the court found that Jonas represented to Goodman that he had constructed the building as owner and used it for furniture manufacture for years without interference from building, fire or air pollution district officials; that the property was zoned for furniture manufacturing, and that as used by him there were no existing violations of the building code or air pollution requirements; that the plant was in A-1 condition; that he thought Goodman would have no trouble with the APCD in obtaining an incinerator permit, since he himself had had no trouble and knew of nothing wrong but couldn't guarantee it; that he had not been cited for any violation of law and had no trouble with fire inspectors. The court found also that all the above statements were true; that Jonas had not represented to Goodman that the premises complied or would comply with the building laws for any and all uses to which they might be put by Goodman in the process of making furniture; that Jonas had not represented to Goodman that he would enjoy a use of the premises, unrestrained by the building code, greater in volume, or located differently thereon, than the operations he conducted at the time the lease was executed.

The court also found that in entering into the lease, Goodman and his attorney did not rely on statements relative to compliance with regulations but in fact checked the zoning classification with the authorities and that Jonas agreed to make the premises comply to the extent of his use at the time of the lease in the event a violation might exist with respect thereto.

The court reached the following conclusion in its declaration of rights under the lease: "(a) that plaintiff is required to make at his sole expense any alterations, additions or modifications by way of installing interior walls, or partitions, or the fireproof surfacing of walls necessary to uses proposed or contemplated by him in connection with the demised premises; (b) that defendant is not obligated to repair, reconstruct or replace the mill incinerator; (c) that defendants are obligated

to make, at their expense, any additions, modifications or repairs hereafter required to make or keep the structure legally usable to the extent of the use and occupation made at the inception of the Lease by lessors; subject to the calamitous causes as defined in the Lease, and lessee's liability for its negligence thereunder; and there is no such lessor liability for those causes alleged in this action.''

One of the paramount questions presented by this appeal is Goodman's contention that the trial court erred in excluding extrinsic evidence as an aid in construing the lease. This is borne out by the record, which indicates that the court entertained the conviction that the language of the lease so plainly and lucidly manifested the intention of the parties as to be alone determinative of the obligations thereunder and that to permit an inquiry into the factual circumstances accompanying and surrounding the formulation of the lease would violate the parol evidence rule. The record is replete with instances where extrinsic evidence offered as a guide to interpretation of the lease was stricken as to the count for declaratory relief, and admitted for consideration only on the fraud count. A typical example may be cited. At a meeting between the parties, attended also by Goodman's attorney, Ostrow, Goodman testified that he told Jonas he wanted it understood, for purposes of drawing up the lease, that he was not going to spend money on ''Your building'' and that if there was anything that had to be fixed or changed so that he might manufacture furniture in every way, Jonas would be responsible for the changes in the building. Goodman testified Jonas told him he agreed to this. All this testimony was stricken as to the first count. Various other items of evidence relating to the subject of Jonas' statements that he would be responsible for certain changes in the building that might be necessary under the requirements of the building laws were likewise either stricken with respect to the first count or refused admission into evidence.

The rationale of the court's rulings, and its determination that extrinsic evidence was not required to illuminate the intention of the parties to the lease, appears from its comments made in this connection. Early in the case, the court stated: ''We have to get down to the question of what the claimed conditions are and find out. But I haven't any difficulty with the face of the instrument thus far because it is very specific . . . I can foresee that we will be met by the parol evidence rule right away if we proceed on the theory

that we are interpreting the contract as drawn, and a lot of statements made as to what the negotiations were, and so forth, is not competent if that is the fact.'' Later on, the court observed: ''Actually you cannot get into the parol evidence rule and these other things aren't there unless the contract on its face is not explicit . . . And I think, as far as I can read, that it is explicit, and as far as what the contract means, I think it could stand on its face.'' At another point, in discussing sections of the lease previously adverted to, the court stated: ''Now, as I read those sections and to the extent that I have interpreted them, I think they are clear and direct, and that there isn't any conflict about them.'' Still later, the court observed: ''The practical construction of the parties is only resorted to as an aid in constructing the language of the instrument if it is doubtful, and I hold that it is not.'' In ruling on extrinsic evidence offered by Goodman, which had been received subject to a motion to strike, the following colloquy occurred: ''THE COURT: All of which is stricken, except on the fraud count. (MR. COHN (Goodman's attorney): Yes, your Honor. (THE COURT: On the ground of violating the parol evidence rule. MR. COHN: I am offering it, your Honor, in rebuttal to the testimony given by Mr. Jonas, which I understand was received without limitation. THE COURT: Multiply error by error.'' It is true that the court was inconsistent in that it received extrinsic evidence at times apparently without limitation; yet it repeatedly choked off Goodman's efforts to establish the meaning of the terms used in the lease by reference to the circumstances attending its execution by accepting the thesis that the parol evidence rule would be violated if such evidence were considered. This would constitute a fundamental and prejudicial error if the lease was in fact ambiguous or equivocal in some vital area. It is to this question that we now advert.

It has been observed that the public authorities required certain building alterations to be effected in order for Goodman to pursue his enlarged manufacturing process. The court found that in addition to partitioning required for this purpose, it is reasonably necessary either that two presently existing *bearing walls* be removed and other *bearing walls* be placed on the premises, or that the doorways and clerestory windows in the bearing walls be closed or provided with proper fire doors, and that such bearing walls wherein openings are so closed be made one-hour fire resistive by the appli-

cation of plaster or gypsum on both sides.'' (Italics added.) Paragraph 15 of the lease, which may profitably be set forth again for convenient reference, provides: ''FIFTEENTH: Lessee will, at his sole cost and expense, faithfully observe in the use of the premises all municipal, state and federal regulations, ordinances and statutes now in force or which may hereafter be in force. Lessor agrees to bear the expense of *any structural building repair or modification* which shall legally be required by any municipal, state or federal regulation, ordinance or statute, which repair or modification shall not be due to the negligence, carelessness or wrongful conduct of the Lessee or to the Lessee's using the demised premises for a purpose other than that of the manufacture of furniture and all phases thereof.'' (Italics added.)

It is at once obvious that paragraph 15 carries within itself a seeming incongruity and uncertainty, for while Goodman thereby covenants to comply with all rules and regulations of the governmental authorities in the use of the premises, Jonas has likewise covenanted that where structural changes are required by such orders they will be paid for by him unless caused by Goodman's fault or by his using the premises for a purpose other than manufacturing furniture ''and all phases thereof.'' It is apparent that in an attempt to limit the scope of the agreement, the parties expressly excluded any obligation on Goodman's part to make structural repairs or modifications so long as he used the premises for furniture manufacture. As to the language used, which requires Jonas to make ''structural building repair or modification,'' there is compelling force to Goodman's contention that its meaning is sufficiently ambiguous when considered both in its juxtaposition to the language of the preceding sentence and in context with other lease provisions to have demanded a full exploration by extrinsic evidence of what the parties intended to signify thereby. We are not dealing with such term in any technical sense it might have if found in a building ordinance or zoning law but are concerned simply with the meaning imparted to it by two businessmen entering upon a lease of premises to be used for furniture manufacture. As such, these words cannot be said to have any fixed or immutable meaning but are merely a relatively elastic symbol of an idea sought to be communicated in more or less imprecise fashion. The crux of the whole case lies in the construction of the covenants of the lease hitherto mentioned; and the vital question presented was whether the modifications re-

quired by the public authorities, which concededly affected the interior *bearing walls* of the buildings and were in the nature of changing an existing condition and replacing it with new and different material to render it fireproof, could be said to be "structural" in the sense contemplated by the parties.

The trial court chose to arrive at the intention of the parties as to the scope of such a covenant solely from the provisions of the lease without considering the surrounding circumstances and concluded that the work required to make the building fireproof was not a structural modification within the obligation assumed by Jonas. However, the changes ordered by the building inspector involved work upon the interior bearing walls of the premises, a reconstruction of which would affect a very substantial portion of the premises by enlarging the occupancy use of the north half; and when made, would be permanent in nature, would presumably add materially to the value of the property and have the ultimate effect of converting a large part of the premises into a fireproof area suitable for the more hazardous phase of furniture manufacture. Whether this character of improvement, which might normally be expected of an owner, was embraced within Jonas' obligation under paragraph 15 could only be developed by an inquiry into such antecedent and contemporaneous circumstances attending the formation of the lease as would clearly the meaning of the term "structural . . . modification" as used by the parties. Certainly, this terminology is neither free from doubt nor subject of easy characterization as used in a lease. The ambiguity is further established by section 12, which allows Goodman to install spray booths and move *nonbearing partitions* without Jonas' consent and to make only such other alterations as were consented to in writing by Jonas. That paragraph provides, nevertheless, that all such improvements and alterations are to remain Goodman's property even though annexed to the realty. However, it is clear that the work required by the county to fireproof the walls would be permanent additions to the structure which it is likely Goodman could not readily remove at the termination of his tenancy without damaging the premises. Furthermore, article 11, although it relates to the reciprocal covenants of the parties to repair, is significant in its choice of language. That section devolves upon Jonas the responsibility to keep in good order "the structure of the interior bearing walls." This lends force to the interpretation that modifications of the bearing walls such as are here required might have been "struc-

tural'' in the sense this term was used by the parties. While this conclusion is certainly not compelled as a matter of law by the various factors and considerations to which we have alluded, it points up the court's prejudicial error in its consistent exclusion of evidence of the factual circumstances accompanying the execution of the lease which would have served to ascertain the real intent of the parties as to the meaning of language of doubtful signification.

■ A lease is a contract as well as a conveyance. (15 Cal.Jur., p. 614.) ■ Where doubt arises as to what the rights, duties and obligations of the parties are under the terms of a lease, the statutory rules for the construction of contracts are applicable. (*Knox* v. *Wolfe*, 73 Cal.App.2d 494, 499 [167 P.2d 3].) These statutory rules of interpretation are embodied in sections 1635 through 1662 of the Civil Code. ■ The three elementary principles to be deduced therefrom in relation to the instant problem are: (1) The intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding its execution and the object sought to be accomplished by the parties; (2) The language must be given its ordinary meaning unless a technical or special meaning is clearly intended; (3) The lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible.

■ Since the lease is ambiguous in the particulars we have mentioned, the understanding of the parties as to the meaning of the term ''structural'' building repairs and modification cannot be determined as a matter of law. Evidence should have been received and all the facts considered which would have aided the court in ascertaining the connotation which the parties ascribed to the phrase in question. In *Fricke* v. *Braden*, 55 Cal.App.2d 266 [130 P.2d 727], the lease contained the term ''Super Market.'' The trial court sustained respondents' objection to the introduction of parol evidence to explain the circumstances under which the lease was made and the meaning of the term understood by the parties. In holding this to be reversible error, the court observed (p. 269): ''For the purpose of determining what the parties intended by the language used, it is competent to show not only the circumstances under which the contract was made, but also to prove that the parties intended and understood the language in the sense contended for; and for that purpose the conversation between and declarations of the

parties during the negotiations at and before the time of the execution of the contract may be shown.'' Continuing its discussion at page 271, the court remarked: ''What the precise meaning of the term was, as understood by the parties in a given case, can best be ascertained by the conversations between, and the declarations of the parties at and before the time of the execution of the lease. We therefore conclude that the trial court erred in sustaining respondents' objections to the introduction of parol evidence explaining the circumstances under which appellant's lease was made, and the meaning of the term ''Super Market'' as understood by the lessor and lessee at the time appellant's lease was executed. While it may be true, as respondent Braden contends, that the evidence sustains the findings of the trial court, yet this ruling of the court prevented appellant from introducing evidence that was material to the issues.''

This is the rule here applicable. At the time the lease was executed, Jonas was informed of Goodman's plans to conduct an expanded operation at the premises. The lease gave him the right to make certain nonstructural changes without the consent of the lessor. However, as to other changes such as the type here involved which would have affected bearing walls, he was expressly forbidden to alter the premises without the written consent of the owner. And, as we have seen, it is clear that the parties contemplated an allocation of costs as to alterations that might be required by public authorities, because Jonas agreed to bear the expense of structural modifications so ordered. No fair and just determination of who would bear the expense of the modifications here required was possible without the receipt of all proper evidence as to the meanings the parties attributed to the words used. The court repeatedly blocked Goodman's efforts to introduce such evidence and plainly expressed its position that it would not consider such evidence on the first count.

In the case at bar, the ambiguities in the lease were such that the parties thereto could not agree on who was required to bear the expenses of particular modifications. As to the work in the mill area, which Jonas paid for after notifying Goodman he would demand reimbursement, the court found this to be Jonas' obligation. This is a clear illustration of the uncertainty of the parties' rights and obligations because of the imprecise language employed. Furthermore, though there is no such language in the lease, the court concluded that Jonas was obligated to make at his expense such modifi-

cations as were required only to make the premises usable to the extent of his own use at the time of the inception of the lease. ▮ In the recent case of *Beneficial Fire & Cas. Ins. Co.* v. *Kurt Hitke & Co.*, 46 Cal.2d 517 [297 P.2d 428], the Supreme Court had occasion to restate the controlling principles as to when oral evidence is admissible to explain the language of a contract or to ascertain the intention of the parties. In reversing for failure to admit extrinsic evidence, the court states (p. 530): ''When the language used is fairly susceptible to one of two constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties . . . not to show that 'the parties meant something other *than* what they said' but to show 'what they meant *by* what they said' . . . ▮ Where any doubt exists as to the purport of the parties' dealings as expressed in the wording of their contract, the court may look to the circumstances surrounding its execution—including the object, notice and subject matter of the agreement . . . —as well as to subsequent acts or declarations of the parties 'shedding light upon the question of their mutual intention at the time of contracting' . . . ▮ *'Once something has to be read into a contract to make it clear, it can hardly be said to be susceptible of only one interpretation. It would have been error for the trial court to read something into the contract by straining "to find a clear meaning in an ambiguous document, and having done so exclude the extrinsic evidence on the ground that as so* construed no ambiguity exists.' '' (Italics added.)

▮ For the foregoing reasons, we conclude that the court committed prejudicial error in refusing to consider extrinsic evidence to explain the meaning of the lease and in excluding or striking much evidence that was competent and relevant. Since such error precluded a proper determination of the issues under the first count, a retrial thereof will be necessary.

▮ In connection with the alleged misrepresentations involved in the fraud count, the trial court found that Jonas truthfully represented that he had used the premises for many years for furniture manufacture without interference from public authorities and that as used by him there were no violations of existing regulations; that the plant was in A-1 condition; that he believed, without being able to guarantee, that Goodman would be able to obtain an incinerator permit. The record fully supports these findings, as well as the further finding that Jonas never represented that the premises complied or would comply with the building laws for any and all

uses to which they might be put by Goodman in the process of making furniture. There is also no merit in Goodman's argument that Jonas' conduct in offering to lease him a building in which he was operating a furniture business constituted actionable fraud on the theory that there was an implied representation that Goodman could engage in all phases of furniture manufacturing therein without violating the law. Assuming there was such a representation by conduct, the court found that Goodman did not rely on any representations made by Jonas regarding compliance of the building with existing regulations. The record discloses that Goodman and his attorney, Ostrow, were conscious of this problem because of an experience Ostrow had in this regard with another client and that Ostrow made his own investigation of these matters. The evidence also shows that Goodman and various individuals acting on his behalf made numerous inspections of the premises and were given full and free access to all parts of the building and had every opportunity to examine the type of operation conducted by Jonas and the character of the premises.

It is a well settled rule that where a party relies on his independent investigation after acquiring all the knowledge he desires without hindrance, he will not be heard to say that he relied on the representation of the other party. (*Teipel* v. *Southern Nevada Vending Co.*, 124 Cal.App.2d 671, 673, 674 [268 P.2d 1081] ; *Cameron* v. *Cameron*, 88 Cal. App.2d 585, 593-594 [199 P.2d 433].) The trial judge may well have felt it was more logical to assume that Goodman and his attorney satisfied themselves as to the extent of the building's compliance with the appropriate governmental regulations, and relied on the provisions of the lease to demark the financial responsibility of the parties in the event of intervention by the public authorities. We are therefore not at liberty to disturb the court's finding, since there is substantial evidence in support thereof in the record. As an appellate court, we cannot countenance Goodman's attempt to reargue the weight of this evidence.

The judgment is affirmed insofar as it denies damages to plaintiff on the second cause of action for fraud; it is reversed as to the first cause of action for declaratory relief. Each party is to bear his own costs on appeal.

Moore, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied July 27, 1956.