[Civ. No. 29957.    Second Dist., Div. Five.    Aug. 29, 1967.]

*HARRY SILVER, Plaintiff and Appellant, v. BEVERLY HILLS NATIONAL BANK, Defendant and Respondent.

*Reporter's Note: This case was previously entitled, ''Silver v. Atlantic-Pacific Auto Leasing, Inc.''

Greenberg, Shafton & Bernhard, Herbert A. Bernhard and Arthur Karma for Plaintiff and Appellant.

Loeb & Loeb and Howard I. Friedman for Defendant and Respondent.

HUFSTEDLER, J. — Appellant Silver filed a complaint seeking damages against Atlantic-Pacific Auto Leasing, Inc. ("Atlantic-Pacific") for breach of contract and against Beverly Hills National Bank ("National Bank") for a declaration of the respective interests of Silver and National Bank in certain equipment leases of which Atlantic-Pacific was lessor. Judgment was entered in favor of Silver against Atlantic-Pacific in the sum of $26,677.49, less certain credits, following Atlantic-Pacific's default, from which portion of the judg-

ment there is no appeal. Following motions for judgment on the pleadings made both by Silver and National Bank, judgment was rendered declaring that Silver owned a divided one-half interest in the described leases and equipment and that Silver had no interest in the other half of the same leases and equipment as to which National Bank owned a security interest.

The two instruments upon which Silver's claims rest are two written contracts between Silver and Atlantic-Pacific, copies of which were incorporated into the complaint.

The first agreement, dated May 3, 1963, recited that Atlantic-Pacific wanted to sell and Silver wanted to buy "a divided [*sic*] one-half (½) interest" in a lease between Atlantic-Pacific, as lessor, and Harris & Carr, Inc., as lessee. Following the recitals are the following covenants:

"1. By this document ATLANTIC-PACIFIC sells and transfers to the Second Party a divided one-half (½) interest in the above described lease, and a divided one-half (½) interest in the property attached hereto as exhibit 'B', for a total of $33,379.10.

"2. It further covenants and agrees with the Second Party that the said Second Party has an absolute right to $639.32 on the 20th day of May, 1963, and the 20th day of each and every succeeding month during the entire term of the said lease, and ATLANTIC-PACIFIC guarantees that it will remit this amount on the day due without regard to the Lessees compliance with the payment schedule called for in the said lease.

"3. That Second Party has a divided one-half (½) interest in the residual of $5,114.54, and ATLANTIC-PACIFIC covenants and guarantees that within thirty (30) days from the end of the lease period to pay to the Second Party the sum of $2,557.27.

"In consideration of the above covenants, Second Party hereby covenants and agrees as follows:

"1. That he will remit to ATLANTIC-PACIFIC at the time of the execution of this document, $33,379.10.

"2. That he will refrain from interfering with the services and management of the above described lease.

"3. That he will look solely to ATLANTIC-PACIFIC for the carrying out of the provisions of this Agreement.

"4. Both parties to this Agreement hereby covenant and agree that in the event ATLANTIC-PACIFIC shall fail to carry out the terms of this Agreement as set forth, any such failure shall be deemed a material breach of this Agreement, and the

Second Party shall have a right to look to the above named Lessee, and the above described lease, as well as ATLANTIC-PACIFIC *and all collateral*, for the enforcement of his rights herein.'' [Italics added.]

The second agreement, dated May 14, 1963, recites that Atlantic-Pacific wants to sell and Silver wants to buy a divided one-half interest in 25 listed leases between Atlantic-Pacific, as lessor, and the named lessees. Following the recitals, the May 14 contract contains covenants substantially the same as those in the first agreement, except for the description of the property which is the subject of the agreement and the addition of a clause stating:

''5. Both parties to this Agreement hereby covenant and agree that ATLANTIC-PACIFIC shall file liens on the various chattels involved in exhibits E and J hereto, showing the SECOND PARTY as the mortgagee to the extent of his divided one-half ($\frac{1}{2}$) interest in the residual as set forth in the above exhibits.''

The claim of National Bank stems from an agreement entitled ''Assignment' between National Bank and Atlantic-Pacific, dated June 6, 1963. The assignment states in part that Atlantic-Pacific assigns to National Bank as security for specified antecedent indebtedness owed by Atlantic-Pacific to National Bank ''all of Assignor's right, title and interest in and to . . . [t]he personal property leases herein below described (copies of which are attached hereto) and the personal property described therein. . . . Assignee does not assume any liability under any of the leases assigned to it either by virtue of this Assignment or by virtue of the receipt of any payments it may hereafter receive thereunder.'' The assignment further provided: ''Assignee shall have all of the rights in connection with this Assignment that would accrue to it had Assignor executed a general collateral pledge agreement in favor of Assignee in the form attached hereto . . . except such rights as are inconsistent with the specific terms of this Assignment. . . .''

Annexed to the assignment was a list of the same leases[1] and equipment which were the subject of the two agreements between Silver and Atlantic-Pacific.

Silver and National Bank argued in the trial court and here argue that the Silver agreements are clear and unambiguous, but Silver says the agreements clearly mean one thing, and National Bank says they clearly mean another.

---

[1] Except one lease, which was the subject of a subsequent assignment.

Silver has advanced a variety of different constructions of the two agreements. In his complaint Silver averred that the effect of the agreements was to assign to him all of Atlantic-Pacific's right, title and interest in the several leases as security for the performance of Atlantic-Pacific's obligations to him, that upon default of Atlantic-Pacific all rentals became payable to him until the default was completely cured, and that National Bank's assignments were subsequent and subordinate to his own. In the joint pretrial statement the parties agreed that Silver purchased a half interest in all of the various personal property leases (the ''Silver half'') and that he was entitled to receive one half of all rentals paid by the various lessees. Silver thereupon contended that Atlantic-Pacific assigned him a security interest in the remaining half of the property (the ''Atlantic-Pacific half'') and all of the rentals until such time as the total payments contemplated by the two agreements were fully paid to him. When the motions were heard, Silver claimed that Atlantic-Pacific assigned him the Atlantic-Pacific half as security for Atlantic-Pacific's ''guarantee'' to pay Silver the monthly payments and half the ''residuals,'' which assignment became effective as soon as Atlantic-Pacific defaulted. Silver did not then contend that Atlantic-Pacific assigned Silver all the rents in the event of Atlantic-Pacific's default, excepting only as such assignment is embraced in the claimed assignment of the Atlantic-Pacific half as security. On appeal Silver sometimes contends that the agreements assigned him the Atlantic-Pacific half as security for accrued and unpaid sums owed by Atlantic-Pacific to Silver and as security for future sums to become due during the lives of the leases and thereafter at the end of the leasehold terms.

National Bank has consistently urged that although Silver's interest in the Silver half, however that interest should be properly characterized, is superior to National Bank's interest, Silver owns no interest whatsoever in the Atlantic-Pacific half, and that National Bank, succeeding to Atlantic-Pacific's interest, owns the Atlantic-Pacific half as security for Atlantic-Pacific's indebtedness to it.

At the time the trial court ruled upon the respective motions for judgment on the pleadings, the court had before it the opposed interpretations of both parties in respect of the Atlantic-Pacific half. The court could not grant either motion unless the court could determine as a matter of law from the face of the pleadings that the agreements were susceptible

solely of the interpretation placed upon the documents by the respective moving party. Thus, to grant National Bank's motion the court must have decided not only that the agreements were unambiguous but also that the sole interpretation to which they were susceptible was that urged by National Bank.

■ A motion for judgment on the pleadings is in the nature of a general demurrer. For the purpose of ruling on the motion, the averments of the pleading against which the motion is directed are deemed true and the moving party admits the untruthfulness of his own allegations insofar as they have been controverted. (*MacIsaac* v. *Pozzo* (1945) 26 Cal.2d 809, 812-813 [161 P.2d 449].) The admissions thus made for the purpose of ruling on the motion vanish as soon as the motion is ruled upon. (*Hale* v. *Gardiner* (1921) 186 Cal. 661, 665 [200 P. 598].) ■ A motion for judgment on the pleadings is an appropriate means of obtaining an adjudication of the rights of the parties in a declaratory relief action if those rights can be determined as a matter of law from the face of the pleading attacked, together with those matters of which the court may properly take judicial notice. (*Wilson* v. *Board of Retirement* (1957) 156 Cal.App.2d 195, 200-201 [319 P.2d 426].) [2]

■ Silver's agreements with Atlantic-Pacific are bristling with ambiguities and uncertainties. The following are among the many uncertainties in the agreements:

Both agreements use the neologism "divided half interest." The term has no specific common or legal meaning. Did the parties intend that there should be a conveyance of some present interest in identifiable property to Silver? If they did, the manner of the intended division must be ascertained outside the face of the contracts since neither contract makes any division of the assets and neither provides any formula by which a division should be made. On the other hand, did the parties intend the word "divided" to mean "undivided"? Even though Atlantic-Pacific and Silver have agreed that Silver owns "a divided interest" we cannot properly interpret the significance of that agreement without knowing what "divided half interest" means. Moreover, it is extremely diffi-

---

[2] The court properly takes judicial notice of its own records in a particular case. (Witkin, Cal. Evidence (2d ed. 1966) § 169, pp. 155-156.) The court could therefore properly have taken judicial notice of the joint pretrial statement containing the matters of fact and law agreed upon by the parties. See also *Flores* v. *Arroyo* (1961) 56 Cal.2d 492, 496-497 [15 Cal.Rptr. 87, 364 P.2d 263].

cult to characterize the Atlantic-Pacific half unless we know how to define Silver's half.

Both agreements use the word "guarantees" in describing the obligation of Atlantic-Pacific to make the specified payments to Silver. Silver sometimes suggests that the word "guarantees" was used in the technical sense that Atlantic-Pacific agreed to answer for the debt or default of another, namely, the lessees' obligations to pay rent. But the two agreements contemplate not only the payment of rent but other kinds of payments in which Atlantic-Pacific is the primary obligor, such as the payment of "residuals." In the context of these agreements does the word "guarantees" mean anything more than "promises"?

The provisions of the paragraphs numbered 4 are especially troublesome. Those paragraphs give Silver "a right to look to the above named Lessee[s], as well as Atlantic-Pacific and all collateral, for the enforcement of his rights herein," in the event Atlantic-Pacific defaults. Does the language mean that Atlantic-Pacific thereby assigned to Silver a security interest in the Atlantic-Pacific half in the event of default, as Silver contends? Or does the clause merely state the condition upon which Silver's enjoyment of his "divided half interest" vests, as National Bank contends? Although National Bank's construction of the instruments is more persuasive than is Silver's, we cannot say that National Bank's interpretation is the only reasonable construction to which the agreements are susceptible.

Oral evidence is plainly admissible to explain these contracts.[3] ▉ "When a contract is in any of its terms or

[3]Silver's counsel closed his argument for judgment on the pleadings by saying: "We feel that the contracts are clear and unambiguous. *We are still prepared, if you should decide that the word 'collateral' is not clear to you, we have witnesses here, we have the attorney who prepared the document.* We have Mr. Harry Silver, who is one of the parties to the document present, and we also have the attorney who handled the immediate correspondence and communications with the bank." [Italics added.]

Evidence is not admissible either in support of or in opposition to a motion for judgment on the pleadings. However, the trial court was apprised that in the event Silver's motion for judgment on the pleadings was denied, evidence to explain the instruments was available. If the case had been tried, a very different situation would have been presented. For example, if Silver had introduced the documents into evidence and rested without the production of any evidence to aid in the interpretation of the instruments and if National Bank had likewise presented no evidence, both the trial court and the appellate court would be obliged to select the most reasonable interpretation of the agreements even though both of them were riddled with ambiguities. (See *Parsons* v. *Bristol Dev. Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].)

provisions ambiguous or uncertain, 'it is primarily the duty of the trial court to construe it *after a full opportunity afforded all the parties in the case to produce evidence of the facts, circumstances and conditions surrounding its execution and the conduct of the parties relative thereto.*' (*Barlow* v. *Frink,* 171 Cal. 165, 172 [152 P. 290].) . . . ▋ 'It is a settled rule that when the language employed is fairly susceptible of either one of two constructions contended for without doing violence to its usual and ordinary import an ambiguity arises where extrinsic evidence may be resorted to for the purpose of explaining the intention of the parties . . . (*Balfour* v. *Fresno Canal & Irr. Co.,* 109 Cal. 221 [41 P. 876].)' " *Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 443 [116 P.2d 62]. (See also *Beneficial etc. Ins. Co.* v. *Kurt Hitke & Co.* (1956) 46 Cal.2d 517, 524-525 [297 P.2d 428].) ▋ Judgment entered in favor of National Bank following its motion for judgment on the pleadings cannot be sustained unless Silver is estopped from challenging National Bank's interpretation of the agreements. National Bank argues that Silver is foreclosed by the doctrine of invited error from claiming on appeal that the agreements are ambiguous because he himself urged that the agreements were unambiguous when he moved for judgment on the pleadings. The difficulty with this argument is that the error Silver invited was not the error of which he complains on appeal. Silver unsuccessfully invited the court to hold that the contracts were susceptible solely of the interpretation he placed upon them. The court properly rejected his motion. Silver is not bound on appeal by an argument he unsuccessfully advanced in the trial court solely for the purpose of obtaining a ruling on his motion for judgment on the pleadings.

The judgment is reversed.

Kaus, P. J., and Stephens, J., concurred.