**UNITED MERCURY MINES COMPANY,
a corporation, Appellant,**

v.

**BRADLEY MINING COMPANY,
a corporation, Appellee.**

**No. 14705.**

United States Court of Appeals
Ninth Circuit.
May 15, 1956.

Paul S. Boyd, Boise, Idaho, E. H. Casterlin, Pocatello, Idaho, Dale Clemons, Boise, Idaho, William Langer, Bismarck, N. D. and Washington, D. C., for appellant.

John Parks Davis, San Francisco, Cal., Moses Lasky, William E. Colby, Brobeck, Phleger & Harrison, San Francisco, Cal., Ray, Quinney & Nebeker, Paul H. Ray, Salt Lake City, Utah, Cheney, Marr, Wilkins & Cannon, G. A. Marr, Salt Lake City, Utah, Ralph R. Breshears. Boise, Idaho, for appellee.

Before DENMAN, Chief Judge, and POPE and LEMMON, Circuit Judges.

DENMAN, Chief Judge.

This is an appeal by the United Mercury Mines Company, a corporation, hereafter United, in a suit by United against Bradley Mining Company, hereafter Bradley, from a summary judgment. The District Court dismissed United's complaint which sought a judgment declaring its right to royalties from Bradley on metals produced from minerals taken from Bradley's mines which were smelted and sold by Bradley.

The mines in question were originally owned by United and operated by Bradley. At that time the ores were run through a concentration plant near the mines and then sold to outside smelters. Thereafter, on December 31, 1941, United sold the mines to Bradley for an agreement whereby Bradley was to pay United a royalty of 5 per cent on all net smelter returns, net revenue, and net mint returns, as defined in the contract.[1] In 1949, Bradley erected its own smelter at the mines to convert the mined ores into metals. The controversy between the parties concerns whether in computing royalties Bradley may be credited with the costs of constructing and operating this smelter at the mine.

---

1. The Contract contained the following provisions:

"For and in consideration of the premises and the conveyance and assignment of the above described properties, Bradley, for itself, its successors and assigns, does hereby covenant, promise and agree to pay to United, its successors and assigns, a royalty of five per cent (5%) on all net smelter returns, net revenue, and net mint returns, as defined herein, upon and for all minerals, ores, metals or values, of any and every kind and character, mind, extracted or taken from the above described mining claims, or any part thereof, or from any lands, grounds or claims, lodes or deposits, within the exterior boundaries of said groups of claims;

\* \* \* \* \*

"By net smelter returns, as used herein, is meant the amount received from the smelter from any and all ores, concentrates, metals or values shipped to a smelter, it being understood that the smelter will deduct its normal smelting charges and charges for railroad freight from Cascade, Idaho, to said smelter shall also be deducted.

"By net revenue, as used herein, is meant the amount paid by any purchaser from the sale of concentrates, ores, metals or values shipped, taken or produced from said properties, less marketing and shipping costs from Cascade, Idaho.

"By net mint returns, as used herein, is meant the amount paid by any United States Mint, branch or agency thereof, less all shipping and marketing costs from Cascade, Idaho."

United's complaint asserted that Bradley was not entitled to make such deductions since the following provision of the contract governed the royalty computations: "Bradley * * * does hereby * * * agree to pay to United * * * a royalty of five per cent (5%) on all * * * net revenues * * * By net revenues, as used herein, is meant, the amount paid by any purchaser from the sale of * * * metals or values shipped, taken or produced from said properties * * *."

The District Court found that there was no genuine issue as to any material fact and that Bradley was entitled to a judgment as a matter of law since the Court held that the "net revenue" clause did not apply and United was unwilling to present evidence on any other theory. The Court's reasons for its decision are as follows:

"On consideration of the contract as a whole I find no sufficient reason for believing that either party intended that the Bradley Company was to shoulder the cost of smelting in event it constructed a smelter on the ground, or, to put it another way, that the parties understood that the royalty would in such circumstances be computed under the net revenue clause, as * * * [United] * * * now contends. In my opinion certain language in the definition of the term "net smelter returns" precludes the existence of such an understanding even though the language is vague when read in the light of the practice."

The "net smelter returns" clause referred to by the District Court provides: "[Bradley shall] pay United * * * a royalty of five per cent (5%) on all net smelter returns * * * By net smelter returns, as used herein, is meant the amount received from the smelter from any and all ores, concentrates, metals or values shipped to a smelter, it being understood that the smelter will deduct its normal smelting charges * * *." By its terms this clause is limited to situations where "amounts are received [by Bradley] from [outside] smelters."

We see no reason why, as a matter of law, the "net revenue" clause could not be controlling. The District Court erred in granting summary judgment for Bradley. In its petition for a rehearing, following an earlier opinion for which this one has been substituted, Bradley urges that notwithstanding the views here expressed, as to the "net revenue" clause, there remains untried an issue of fact in that there are relevant extrinsic circumstances of which it is prepared to offer evidence, as bearing on the meaning of the contract.

Whether such extrinsic evidence is or would be admissible, or whether the writing, as drawn, so precisely fits the very circumstances here, involving amounts paid by purchasers from the sale of metals, that it must be said that all negotiations were "integrated" in the written instrument,[2] must await decision following further hearing in the court below.

The judgment is reversed and the case remanded to the district court.

2. Wigmore on Evidence, 3d Ed. § 2430: " * * * The question being whether certain subjects of negotiation were intended to be covered, we must compare the writing and the negotiations before we can determine whether they were in fact covered. * * * In deciding upon this intent, the chief and most satisfactory index for the judge is found in the circumstance whether or not the particular element of the alleged extrinsic negotiation is dealt with at all in the writing. If it is mentioned, covered, or dealt with in the writing, then presumably the writing was meant to represent all of the transaction on that element; if it is not, then probably the writing was not intended to embody that element of the negotiation."