**UNITED MERCURY MINES COMPANY, a corporation, Appellant,**

v.

**BRADLEY MINING COMPANY, a corporation, Appellee.**

No. 15652.

United States Court of Appeals
Ninth Circuit.

May 5, 1958.

Dale Clemons, Paul S. Boyd, Boise, Idaho, E. H. Casterlin, Pocatello, Idaho, for appellant.

Ralph R. Breshears, Boise, Idaho, John Parks Davis, Severson, Davis & Larson, San Francisco, Cal., Paul H. Ray, Salt Lake City, Utah, Robert E. Brown, Kellogg, Idaho, for appellee.

Before STEPHENS, Chief Judge, and POPE and FEE, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

The interpretation of a written contract entered into by United Mercury Mines Company, which is plaintiff and appellant, and Bradley Mining Company, defendant and appellee, is here involved. This agreement covers certain mining claims in Idaho. The crux of the dispute concerns the method of computing royalties on minerals and ores extracted from mining claims.[1] The cause has had an extended judicial history. Circuit Judge William Healy, sitting in the District Court, granted summary judgment in favor of Bradley, on the ground that the clause in controversy[2] was clear and unambiguous and that the clause should

---

[1] The facts of the dispute are detailed in United Mercury Mines Company v. Bradley Mining Company, 9 Cir., 233 F. 2d 205, 206. They are, briefly, that the parties entered an agreement to convey mining claims, the consideration for which was a royalty provision whereby Bradley promised to pay United a royalty of five per cent on "net smelter returns, net revenue, and net mint returns, as defined herein." The definition of "net smelter returns" was the amount received from the smelter less normal smelting charges. "Net revenue" was the amount paid by any purchaser less marketing and shipper costs. The controversy relates to the question of which clause is applicable to ore concentrates which Bradley sent to its own Yellow Pine Smelter, i.e., whether Bradley may deduct its smelter charges.

[2] The clause in controversy and related definitions are contained in the following provisions of the agreement:

"The contract contained the following provisions:

" 'For and in consideration of the premises and the conveyance and assignment of the above described properties, Bradley, for itself, its successors and assigns, does hereby covenant, promise and agree to pay to United, its successors and assigns, a royalty of five per cent (5%) on all net smelter returns, net revenue, and net mint returns, as defined herein, upon and for all minerals, ores, metals or values, of any and every kind and character, mined, extracted or taken from the above described mining claims, or any part thereof, or from any lands, grounds or claims, lodes or deposits, within the exterior boundaries of said groups of claims;

be interpreted to allow Bradley to deduct normal smelting charges upon materials treated at its own plant. On the first appeal, the original opinion held that the clause was unambiguous but should be interpreted to mean that United should receive its percentage on the materials sold after smelting by Bradley without any deduction of normal smelting charges. Upon petition for rehearing by Bradley, this opinion last mentioned was withdrawn. Appellant contends that the following portion of the substituted opinion constitutes the law of the case:

"The 'net smelter returns' clause referred to by the District Court provides: '[Bradley shall] pay United * * * a royalty of five per cent (5%) on all net smelter returns. * * * By net smelter returns, as used herein, is meant the amount received from the smelter from any and all ores, concentrates, metals or values shipped to a smelter, it being understood that the smelter will deduct its normal smelting charges * * *.' By its terms this clause is limited to situations where 'amounts are received [by Bradley] from [outside] smelters.'

"We see no reason why, as a matter of law, the 'net revenue' clause could not be controlling." 233 F.2d 205, 207.

However, although this opinion reiterates the same construction of the text as did the withdrawn opinion, nevertheless, the cause was remanded to take competent evidence as to the interpretation given by the parties and the circumstances surrounding its making.

The pertinent portion of the opinion reads:

"The District Court erred in granting summary judgment for Bradley. In its petition for a rehearing, following an earlier opinion for which this one has been substituted, Bradley urges that notwithstanding the views here expressed, as to the 'net revenue' clause, there remains untried an issue of fact in that there are relevant extrinsic circumstances of which it is prepared to offer evidence, as bearing on the meaning of the contract.

"Whether such extrinsic evidence is or would be admissible, or whether the writing, as drawn, so precisely fits the very circumstances here, involving amounts paid by purchasers from the sale of metals, that it must be said that all negotiations were 'integrated' in the written instrument, must await decision following further hearing in the court below." 233 F.2d 205, 207.

Upon remand, Judge William Mathes held a pretrial conference, at which important admissions were made by both parties.

In a pretrial order signed by the trial judge and agreed to in respect to form and content by attorneys for both parties, the issues to be tried were clarified. The basic concept of the pretrial order is set out in accordance with the substituted opinion.

It is recited that, if "net smelter returns" are found ultimately to be applied for the operations of Bradley at Yellow Pine Smelter, the returns here-

* * * * * *
" 'By net smelter returns, as used herein, is meant the amount received from the smelter from any and all ores, concentrates, metals or values shipped to a smelter, it being understood that the smelter will deduct its normal smelting charges and charges for railroad freight from Cascade, Idaho, to said smelter shall also be deducted.

" 'By net revenue, as used herein, is meant the amount paid by any purchaser from the sale of concentrates, ores, metals or values shipped, taken or produced from said properties, less marketing and shipping costs from Cascade, Idaho.

" 'By net mint returns, as used herein, is meant the amount paid by any United States Mint, branch or agency thereof, less all shipping and marketing costs from Cascade, Idaho.' " United Mercury Mines Company v. Bradley Mining Company, 9 Cir., 233 F.2d 205, 206, footnote 1.

tofore made by Bradley are correct. There is an express stipulation that there is no dispute as to the meaning of the "net mint return" clause. There is an elaborate stipulation that there is a custom in the smelting industry "for companies who own and operate smelters" "that the smelting charges and the cost of transportation of concentrates to the smelter were deducted to arrive at a net amount commonly referred to in the mining and smelting industries as 'net smelter returns'." United reserved objection to the materiality and relevance of "the recognized practice and custom of the smelting industry" as thus stipulated.

It was also stipulated:

"That it is a matter of common knowledge and historically recognized in the mining industry that the milling of ores to reduce such ores to a concentrate form is a part of the mining process and that the smelting of ores is not a part of the mining process."

United reserved objection to the materiality to any and all issues raised in the action on the ground that the "net revenue" clause was applicable and perfectly clear.

After the issues were clarified by the entry of the pretrial order, a trial was held. The trial court made extensive findings in favor of the Bradley contentions on facts and entered judgment against United, which brought the present appeal.

The trial court found the custom and practice of the smelting industry and of the mining industry were relevant and material. Since these customs and practices tended to explain the clauses "net smelter returns" and "the smelter will deduct its normal smelting charges" and "conducting mining operations and development work upon or in the above-described mining claims," which are used

in the contract, this view was correct. The interpretation of words of art by reference to the practices of the particular industry is a common sense operation and one long familiar in the judicial process.[3]

■ The whole contention of United is that the clause, by clear and unambiguous language, permitted it to share the proceeds of sale of material treated at the Yellow Pine Smelter Mill of Bradley without deduction of normal smelting charges. It would seem that the clauses in question must be held ambiguous after the pretrial order was entered.

■ The most vital definitions of words of the contract are found in the admissions of United in the pretrial order. The reserved objection of United above noted had no validity. When the meanings of these words were thus explained, grave doubt was cast upon the interpretation of the net returns clause suggested in our previous opinion.

The validity of the interpretation of the contract derived from the unexplained text was thus questionable. It was quite clear, after these admissions were of record, that the agreement was, to say the least, ambiguous. Moreover, the previous proceedings seem to forecast this result. The first trial judge had held that the interpretation sought by Bradley was clearly correct. Our Court, in its first opinion, held that the interpretation sought by United was clearly correct on the face of the agreement. Thereafter, on the petition of Bradley, which outlined some of the evidence, this Court remanded the cause for the hearing, although strongly intimating that the textual interpretation of the agreement by the discarded opinion was correct. However, the remand envisaged the situation where some of the evidence might be relevant and that the contract might be held ambiguous. The interpretation in the last authoritative opinion

3. Ross v. Frank W. Dunne Co., 119 Cal. App.2d 690, 697, 260 P.2d 104; Barnett v. Hagan, 18 Idaho 104, 111, 108 P. 743; Haener v. Albro, 73 Idaho 250, 259, 249 P.2d 919. See, also, Restatement, Contracts, §§ 235(b), 245, 246(a), 247(c).

of this Court did not by any means become the law of the case, as United contends.[4] If so, the remand would have been an act of futility. The different positions taken by the first trial judge and our Court in two different opinions would seem to indicate that an ambiguity was present upon this feature.[5] As soon as the customs of the smelting and mining industries were stipulated, these became material and relevant to interpret the language of the agreement. The existence of an ambiguity was probable because of the expansion of the technical meaning of the language, so that the trial court was compelled to hear evidence to establish the meaning of the contract.[6]

Bradley introduced a great amount of evidence to prove that the parties themselves had construed the clauses in dispute to permit it to deduct normal smelting charges and also evidence tending to show that custom in the industry and the circumstances under which the contract entered compelled a like construction. None of this evidence was contradicted or rebutted by United.

The trial court made findings that the parties intended that Bradley should pay the percentage of United upon the net smelter returns, rather than upon the sales price of the materials, without regard to the cost of smelting at its own Yellow Pine plant.

These findings are overwhelmingly borne out by the evidence. It was shown that the parties contemplated that a smelter would be erected by Bradley in the vicinity at the time that the new contract under consideration, which effected a sale of the properties with the price paid over a period of 999 years, superseded a lease agreement which had been in effect between the parties. The stipulation above indicated it would be in accordance with the custom for Bradley to pay the percentage upon the normal net smelter returns. The contract contained a clause that, in the contingency of erection of a local smelter, there should be deducted from the net smelter returns "a fair charge for trucking from the mine to such smelter." It was shown that the net mint returns clause was not in controversy and that the net revenue clause was added as a catchall to prevent any revenue from the materials escaping United.

The parties contemporaneously construed the contract.[7] From 1941 into 1945, Bradley shipped tungsten concentrates from the mine direct to purchasers other than smelters, and paid royalties to United based upon the net revenues. In 1943, Bradley constructed its purification plant at Boise, and treated tungsten concentrates there for two and a half years. Upon these materials when sold, Bradley computed and paid royalties to United on the proceeds after deducting operating costs and depreciation of the purification plant. Monthly settlement sheets were submitted to United, reflecting these sales and deductions under the "net smelter returns" clause, as this treatment is by custom outside the realm of mining. No objection has ever been made by United.

In 1949, Bradley built the Yellow Pine Smelter at a cost of $2,000,000, and operated this plant at its own expense. As

4. This Court, in United Mercury Mines Company v. Bradley Mining Company, 9 Cir., 233 F.2d 205, did not, as pointed out above, decide whether the "net smelter returns" or the "net revenue" clause actually was controlling. Hence, the rule of Bodkin v. Edwards, 9 Cir., 265 F. 621, affirmed 255 U.S. 221, 41 S.Ct. 268, 65 L.Ed. 595, is inapplicable.

5. Barham v. Barham, 33 Cal.2d 416, 422–423, 202 P.2d 289; Stone v. Bradshaw, 64 Idaho 152, 160, 128 P.2d 844.

6. "Where [an] ambiguity is * * * disclosed by extrinsic evidence * * * such ambiguity may be removed by the same means * * *." Williams v. Idaho Potato Starch Co., 73 Idaho 13, 20, 245 P.2d 1045, 1049.

7. Woodbine v. Van Horn, 29 Cal.2d 95, 104, 173 P.2d 17. See, also, Beneficial Fire and Casualty Insurance Company v. Kurt Hitke and Company, 46 Cal.2d 517, 527, 297 P.2d 428; Cottle v. Oregon Mutual Life Insurance Company, 60 Idaho 628, 631, 94 P.2d 1079. See, also, Restatement, Contracts, § 235(e).

above noted, it is agreed that smelting is not part of the mining process. There is evidence that smelting, as well as purification, adds considerable value to the materials. From that time on, part of the antimony and gold concentrates have been treated there and part at other smelters. The deductions of normal net smelter returns by Bradley have been based upon the charges of the outside smelters. United received the monthly reports and payment of royalties for about two years before objection as to the method of computation. A supplemental contract was drawn in May, 1950, which permits Bradley to make these same reports monthly, but to postpone payment of the accrued royalty. There was an attempt to draft a new contract clearing up some of the matters now in controversy, but this was not accomplished. In 1951, United took its present position and brought suit.

It was shown that the definition of the term "mining," as used in the Internal Revenue Code, includes the ordinary treatment processes of materials, but excludes the additional process of purification such as smelting or refining.[3] It was also proved that the word "normal," in the phrase "the smelter will deduct its normal smelting charges," was introduced into a contract between the parties in 1939 and carried over into the contract of 1941, here under consideration, with the definite intention that the clause should be applied when the Bradley smelter had been built, so that United would not be charged beyond what "outside smelters" would have charged for the same process.

The trial court supervised the preparation of a model definitive pretrial order, which sets out the admissions of the parties, the contentions of the respective sides, defines the questions of facts to be tried, and indicates the questions of law. There is incorporated therein a list of the documents to be offered at trial, together with the admissions and objections of the respective parties thereto.

The findings of fact are clear and concise and are responsive to the questions raised in the pretrial order. The legal positions taken by the trial court are set forth in the conclusions, thus resolving the questions of law suggested in the pretrial order. This record sets out with the utmost clarity the facets of controversy.

The decision of this Court in the light of the whole record is that the evidence as to custom of the smelting and mining industries was relevant and material to explain the technical meaning of words used in the contract. At least, thereafter the agreement was ambiguous. The contemporary construction by the parties was admissible. The findings of the trial court as to the facts are not clearly erroneous. The present record contains no indication that a mistake has been made.

Affirmed.

---

8. Internal Revenue Code of 1939, § 114 (b), (4) (B), 26 U.S.C.A. § 114(b) (4) (B) (now Internal Revenue Code of 1954, §§ 613(c) (2), (4), 26 U.S.C.A. § 613 (c) (2), (4).