Filed 8/12/14  P. v. Nava CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>JOSE AMEZCUA NAVA,<br><br>　　　Defendant and Appellant. | F065082<br><br>(Super. Ct. No. 11CM2478)<br><br><br>**OPINION** |
| In re<br><br>　　JOSE AMEZCUA NAVA,<br><br>　　　　On Habeas Corpus. | F068148 |

APPEAL from a judgment of the Superior Court of Kings County.  Donna Tarter, Judge.  ORIGINAL PROCEEDINGS; petition for writ of habeas corpus.

Robert J. Beles and Manisha Daryani for Defendant and Appellant and for Petitioner.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent and for Respondent.

-ooOoo-

A jury convicted appellant Jose Amezcua Nava of one count of committing a lewd and lascivious act on a child under the age of 14 years, his 10-year-old niece. Nava contends reversal is required because of several evidentiary errors, prosecutorial misconduct, and ineffective assistance of counsel. We reject Nava's contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

### Prosecution Evidence

In July 2011, Nava was 59 years old. The victim would often come over to Nava's house to play, swim in the pool, and get help with her homework from her 28-year-old cousin, Jesse. The charged offense occurred when the victim was staying at Nava's house for a three-day visit from Friday, July 22, 2011, to Sunday, July 24.

The victim testified that on Saturday morning Jesse, Nava's 28-year-old daughter, asked her to get milk from a refrigerator located in a detached garage at the residence. The milk was for a baby that was staying at the house. The victim went alone to the garage. When she went inside, Nava was already there fixing something. The victim asked him if he could help her get milk from the refrigerator. Nava opened the refrigerator door and the victim started looking for the milk.

While the victim was looking for the milk, Nava came up behind her, put his hand under her shirt, and started squeezing her breasts. Leaving one hand on her breasts, Nava put his other hand inside the victim's shorts and underwear and started squeezing her vagina. It hurt and the victim told Nava to leave her alone. Nava stopped and warned the

2.

victim that if she told her mom or dad, they would hit her, and if she told her aunt, her aunt would kick him out of the house.

On Sunday the victim walked back to her own nearby house and told her mother, A.B., what had happened. The victim testified that after what happened in the garage, she was scared of Nava and did not walk past his house anymore. The victim acknowledged she sometimes laughed and smiled when she was nervous or scared.

The victim consistently described the incident in the garage during interviews with Sheriff's Deputy Rod Schulman and social service practitioner Delia Acosta-Perez.

A.B. is Nava's sister. She testified she went to Nava's house after the victim told her about the incident in the garage. At Nava's house, Jesse threatened that if A.B. called the police, the victim would be taken from her and A.B. would be deported to Mexico.

A.B. had planned to call the police after she had had a chance to speak with her daughter thoroughly about what happened, but the police came to her house before she had a chance to call them. A.B. also testified she had always had a good relationship with Nava before he touched her daughter.

Sheriff's Deputy Lionel Alvarez assisted Schulman in interviewing the victim on July 27, 2011. Schulman testified that at one point during the interview, he asked Alvarez to go get a diagram. When Alvarez stepped out of the room, the victim became very upset and started to cry. The victim told Schulman she was crying because "she was afraid to be in the room with [him], as an older male, because of what her uncle had done to her."

### *Uncharged Sexual Offenses*

At trial, the parties and the court focused on one uncharged sexual offense involving allegations by another of Nava's sisters, M.N., which allegedly occurred in 1969. The record, however, reflects considerable testimony by the victim, both live and via video recording, of three and possibly more uncharged sexual offenses committed by

3.

Nava on the victim during the summer of 2011 where Nava touched her in a similar manner.

M.N., who was 52 years old at the time of trial, testified that when she was around nine or 10 years old and living with Nava in Mexico, Nava had put his finger inside her vagina, causing it to hurt. She told their mother what happened and it never happened again. Since then, her relationship with Nava had been fine and she never spoke to him about what happened. She could not remember a lot about the incident but recalled it occurred in a bathroom. She previously had told Schulman, however, that the incident occurred in a bedroom.

Acosta-Perez interviewed the victim on August 24, 2011. The video recording of the interview was played for the jury. There, the victim, verbally and with hand motions, described how Nava had touched her in the same manner as the charged offense on each of the three days she stayed with him over the weekend of July 22. Those occurred when Jesse would ask that she retrieve things from the garage refrigerator.[1] She also testified that one night during the same weekend, Nava touched her in a similar manner while she was sitting on a couch in Nava's house, after he locked the door to the room.[2]

### Defense Evidence

Nava testified and denied the victim's accusation that he molested her on Saturday morning when she was getting milk from the refrigerator in the garage. According to Nava's testimony, the only time he and the victim were in the garage together during her

---

[1]The victim also stated in the interview that "he touched me more, but like I don't know to count …."

[2]Nava did not object to the introduction of the video interview containing the evidence of the other instances of sexual touching in the garage or the testimony regarding the incident on the couch.

4.

stay was on the night of Friday, July 22, 2011, when Nava went to get a cake out of the refrigerator.

Nava explained that on Friday night he had more than 15 guests at his house for a church celebration. At some point Jesse asked him to bring the cake to her. Nava headed to the garage, followed by his wife. The victim ran up behind them and Nava handed her the cake when he took it out of the refrigerator. He did not touch the victim in any way at this time. Also, they never kept milk in the refrigerator in the garage but kept it in the refrigerator in the kitchen.

Around 4:00 a.m. on Saturday morning, when it was still dark, Nava and his wife left the house to drive to Tehachapi to visit their son, who was in prison. Nava did not talk to the victim or say goodbye to anybody before they left. The drive to Tehachapi took approximately one hour 45 minutes. Nava did not see the victim until later that day when he met Jesse in front of a store to help her repair a flat tire.

Nava saw the victim briefly on Sunday morning when they were getting ready for church, but they were never alone together that day. The next time he saw the victim was Monday, when he first found out about her accusation, which surprised him. Jesse called Nava while he was working and he came back to the house. When Nava arrived at the house, the victim's mother was there and he asked her to bring the victim over to the house so the victim's mother could see what the victim was saying was not true.

Nava denied his sister's allegations that he molested her approximately 43 years earlier. He testified the house in Mexico, where she alleged the molestation occurred, did not have a bathroom. Nava claimed he and his sister had had disagreements over the years. He explained that when his sister came to Los Angeles, she sold drugs and legal documents and they would argue about that. She would get mad and tell him to "butt [out of] her life."

Jesse also testified and described the Friday night church celebration at Nava's house. During the celebration, Jesse sent Nava to get the cake from the refrigerator in the

5.

garage.  Jesse saw the victim run after Nava and his wife.  The victim then returned carrying the cake, which Jesse took from the victim because it looked like she was going to drop it.

The victim slept with Jesse in Jesse's room on Friday night.  On Saturday morning, Nava and his wife went to visit Jesse's brother in prison, leaving the house around 4:00 a.m.  Jesse did not see Nava again that Saturday until around 1:00 p.m.  The victim was never alone with Nava on Saturday morning.  Jesse was with the victim the whole time, except once when the victim went to change, but that was after Nava and Jesse's mother had left the house.

Jesse did not send the victim to get milk either for her or for a baby on Saturday morning.  The only time the victim asked Jesse for milk was while Nava and his wife were away visiting Jesse's brother in prison.  Jesse and the victim were in the living room when the victim asked if she could get milk so she could eat cornflakes.  Jesse said yes and the victim went into the kitchen to get it.

Jesse learned about the victim's accusations against Nava on Monday, when the victim's mother called her.  Jesse met the victim and the victim's mother at Nava's house.  Jesse called Nava to come home.  Jesse's mother also was present.  Jesse then asked the victim to show them what had happened to her.  The victim brushed her hand down the middle of her chest and below her waist.  While she did this, the victim was laughing and continued to laugh until her mother told her it was not a game.  Jesse denied threatening to turn the victim's mother in to immigration.

After Nava was arrested, Jesse saw the victim walk past Nava's house with other people on three separate occasions.  As they passed by the house, the victim would turn and laugh.

Stephanie Estrada testified she had known Nava for 24 to 25 years.  She used to work at a school where she would see him two to three times a month and had had sufficient contacts with him to form an opinion as to his reputation for honesty.

6.

According to Estrada, Nava was a very honest individual. He was a God-fearing and loving individual who cared about his community and the people with whom he was acquainted. He had a very excellent reputation for the way he treated women and children.

### *Charges, Trial and Sentence*

On August 23, 2011, Nava was charged with one count of committing a lewd and lascivious act on a child under the age of 14 on or about July 23, 2011, in violation of Penal Code section 288, subdivision (a). Nava's jury trial commenced on March 26, 2012, and concluded on March 29. After deliberating for just over an hour, the jury found Nava guilty as charged. On April 27, 2012, Nava was sentenced to six years in prison.

## DISCUSSION

### I.      Admission of 1969 Uncharged Sexual Offense

Nava contends the trial court abused its discretion in admitting the evidence of the 1969 uncharged sexual offense under Evidence Code section 1108. He also claims admission of the evidence violated his constitutional due process rights.

Prior to the commencement of trial, the prosecution filed a motion seeking to admit evidence of Nava's uncharged sexual offense against his sister pursuant to section 1108.[3] In anticipation of the prosecution's motion, the defense filed a separate motion asking the trial court to exclude the evidence under section 352. The trial court conducted a hearing pursuant to section 402, heard argument, and concluded the evidence was admissible. The trial court explained:

> "In this case, the amount of time between the incident with [Nava's sister] and the new victim is 43 years. That is very remote in time. However, the victims were the same age, or approximately the same age when the alleged assault took place. They were family members; Mr. Nava had a position of

---

[3]All further statutory references are to the Evidence Code.

7.

either trust or authority over the two victims; the acts are substantially similar; the evidence that [Nava's sister] … testified to is not particularly inflammatory; and there is very little possibility of confusion of the issues. The … testimony that was elicited from [Nava's sister] took a very short period of time and, therefore, the amount of time involved in introducing and refuting the evidence is not lengthy. So the court—based on viewing the [section] 352 analysis, there is propensity evidence that is highly probative to show intent and far outweighs the prejudicial effect. Court is going to allow the [section] 1108 evidence."

Section 1108 was intended to sweep away the narrow categories of admissibility of other crimes evidence that had existed under section 1101. (*People v. Britt* (2002) 104 Cal.App.4th 500, 505.) Instead, such evidence is admissible whenever it may be helpful to the trier of fact, on a commonsense basis, for resolution of any issue in the case, including the probability or improbability that the defendant has been falsely accused. (See *Britt,* at p. 506.) A trial court, however, retains the discretion to admit or exclude evidence of another sexual offense under section 352. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9; *People v. Callahan* (1999) 74 Cal.App.4th 356, 367-368.) A trial court's exercise of its discretion under section 352 is reviewed for abuse of discretion and will not be disturbed on appeal absent a showing the trial court exercised its discretion in an arbitrary, capricious or patently absurd manner. (*Rodriguez*, at pp. 9-10.)

In *People v. Harris* (1998) 60 Cal.App.4th 727, the court set out five factors for evaluating the admissibility of prior offense evidence: (1) the inflammatory nature of the evidence; (2) the probability of confusion; (3) the remoteness in time of the prior incidents; (4) the consumption of time involved; and (5) the probative value of the prior offense evidence. (*Id*. at pp. 737-741.) Here, the trial court found these factors weighed in favor of admission of the evidence.

Nava argues the evidence should have been excluded because it was too remote in time, particularly since he had led an unblemished life since the uncharged incident with his sister. But similarities between the charged and uncharged acts can balance out remoteness. (*People v. Waples* (*2000*) 79 Cal.App.4th 1389, 1395.) Here, the uncharged

and charged offenses were substantially similar. Both victims were young girls, were family members, and were staying in the same house as Nava at the time of the offenses. Both offenses included touching of the victims' vaginas. The uncharged offense against Nava's sister, which involved digital penetration of the vagina, was more inflammatory than the charged offense against the victim, but not greatly so. The sister's testimony did not consume an undue amount of time. And the jury was instructed properly with CALCRIM No. 1191 that they could, but were not required to, consider this evidence for propensity purposes.[4]

No specific time limit is set forth in the statute and appellate courts have upheld admission of evidence of uncharged offenses that occurred 30 years before. (*People v. Branch* (2001) 91 Cal.App.4th 274, 285.) Remoteness is but one factor to be considered by the trial court. But 43 years is a long time, and if the sexual misconduct evidence was not similar, we likely would reach a different result. Because it is solely within the trial court's discretion to determine whether sexual misconduct evidence is too remote, and where the record demonstrates the court wrestled with the issue and exercised its discretion, we will not disturb the court's ruling.

But, even assuming the trial court erred in allowing the introduction of the 43-year-old uncharged and unadjudicated sexual act, based on the evidence of the other three or more recent uncharged acts involving the victim, we conclude any such error not prejudicial, under either the *Watson* or *Chapman* standards. (*People v. Watson* (1956) 46 Cal.2d 818,836; *Chapman v. California* (1967) 386 U.S. 19, 24.) We can infer from the jury's guilty verdict that they found the victim credible and not Nava.

---

[4]This instruction was not modified to identify the 1969 prior uncharged incident specifically, so the jury also could have considered the evidence of the recent uncharged sexual misconduct involving the victim for propensity purposes.

Nava also claims the probative value of the uncharged sexual offense was "substantially diminished" because his sister's testimony indicated he was between the ages of 16 and 18 and was, therefore, likely a juvenile at the time of the offense. He argues this is significant because of the language in recent United States Supreme Court cases recognizing that juvenile offenders have lessened culpability for crimes they commit and are less deserving of severe punishment than their adult counterparts. (See *Graham v. Florida* (2010) 560 U.S. 48; *Roper v. Simmons* (2005) 543 U.S. 551, 570.)

These authorities do not help Nava, however, because they address the issue of culpability, not propensity. It is not unreasonable to conclude that a defendant with a juvenile history of committing sexual abuse would be more likely to commit sexual abuse as an adult than a defendant without such history. Evidence that Nava as a teenager sexually abused his young sister was highly probative on the issue of the likelihood he would as an adult sexually abuse his young niece.

In short, there is no indication here that the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner. We thus conclude the trial court did not abuse its discretion in admitting evidence of Nava's prior sexual offense under section 1108.

Nava also has forfeited his challenge to admissibility of the evidence on constitutional due process grounds. "An appellate contention that the erroneous admission or exclusion of evidence violated a constitutional right is not preserved in the absence of an objection on that ground below. [Citations.]" (*People v. Daniels* (2009) 176 Cal.App.4th 304, 320, fn. 10.) No objection on the basis of a violation of constitutional rights was made by Nava.

II.     **Exclusion of Proffered Testimony**

Nava contends the trial court erred in excluding as cumulative the proffered testimony of Luis Hernandez that he saw Nava and the victim getting a cake out of the refrigerator in the garage and nothing happened.

The issue of Hernandez's proposed testimony came up during a discussion of additional witnesses the defense planned to call:

>"THE COURT: [Hernandez is] going to testify about the cake, refrigerator incident?

>"[DEFENSE COUNSEL]: Yeah, about being in that area and seeing … him and [the victim], and that nothing happened.

>"THE COURT: I'm going to preclude you from calling Luis Hernandez as cumulative, undue consumption of time. I think it's pretty—it's been pretty well settled that both [the victim] and Mr. Nava got cake from the refrigerator and nothing happened. I'll bet [the prosecutor] would even stipulate to that.

>"[THE PROSECUTOR]: I don't know if I'd go quite that far, but—

>"[DEFENSE COUNSEL]: Well, your Honor, I think it's the Government's theory that that's when the touching happened.

>"THE COURT: That is not.

>"[DEFENSE COUNSEL]: They're going to stipulate to that?

>"THE COURT: It's clear that the Government's theory is when she went to get the milk is when the touching happened, not the cake. So it's different.

>"[DEFENSE COUNSEL]: Well, can we have that stipulation on the record?

>"THE COURT: No, I'm just telling you that from the testimony, it is clear. You've had two witnesses now testify that [the victim] and the defendant went to the refrigerator to get the cake and there were people around and nothing happened. And actually, there's three people that testified. Well, [the victim] testified that it was during the milk incident.

>"[THE PROSECUTOR]: And just for the record, Luis Hernandez's testimony is going to be that he wasn't—he was standing in the yard. He couldn't even see the garage. So for the record, again, for appeal purposes, that's what his testimony would be. That's not relevant.

11.

"THE COURT: My ruling is that it would be cumulative, assuming that he would testify that he witnessed [the] getting of the cake from the refrigerator."

Section 352 gives "the court discretion to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citation.]" (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1337.)

Here, the trial court excluded Hernandez's proffered testimony as an undue consumption of time and cumulative of other evidence. This was a proper exercise of its discretion. The testimony had limited probative value. As the trial court observed in making its ruling, based on the evidence presented, the prosecution's theory was that Nava molested the victim when she went into the garage in the morning to get milk, not when she followed Nava into the garage in the evening to get the cake. Hernandez's proffered testimony tended to show Nava was telling the truth in testifying he did not molest the victim in the garage during the Friday evening church celebration when others were present at his house. It did not, however, tend to prove this was the *only* time Nava had gone into the garage with the victim or that the separate incident she described did not occur. We therefore disagree with Nava's assertion that in excluding Hernandez's testimony, the trial court prevented Nava from presenting "strong evidence" he was "innocent of the charged crime."

Contrary to Nava's assertions, the prosecution did not suggest to the jury that it could find the charged offense occurred during the Friday evening celebration when Nava and the victim took the cake out of the refrigerator in the garage. Despite the prosecutor's expressed reluctance to stipulate that nothing happened, she presented no evidence or argument suggesting Nava molested the victim during the cake incident or even disputing the incident occurred. Although, as Nava points out, the prosecutor did state in her opening argument that the charged offense occurred at night, she corrected

12.

herself at the beginning of closing argument and explained to the jury she misspoke in opening argument.

Nava also claims the prosecutor argued the alleged touching could have happened at *any* time over the weekend. Not so. On the pages of the reporter's transcript Nava cites to support his assertion, the prosecutor argued that the alleged molestation could have "happened Friday morning, Saturday morning, or Sunday morning. You don't have to agree on which day it happened, you just have to agree it happened on or about Saturday morning."

The trial court's conclusion the proffered evidence was cumulative of other evidence also was reasonable. Both Nava and Jesse presented undisputed testimony that a number of guests attended the Friday evening church celebration at Nava's house when he went to get the cake from the refrigerator in the garage. Jesse also testified she saw Nava's wife go with him into the garage, followed by the victim, who reappeared shortly carrying the cake. Although Jesse did not testify she could see what was happening inside the garage after the victim followed Nava and his wife inside, Jesse's testimony corroborated Nava's testimony that his wife was present in the garage when he took the cake out of the refrigerator and gave it to the victim and was circumstantial evidence Nava did not molest the victim at that time.

On the record before us, we cannot agree with Nava's argument that Hernandez's proffered testimony added significant details to the testimony already presented or was crucial to his defense.

## III. Exclusion of Evidence Relevant to the Victim's Credibility

Nava contends the trial court abused its discretion in excluding evidence he claims was relevant to the issue of the victim's credibility. He also claims the exclusion of the evidence violated his constitutional rights to present evidence in his own defense and to confront and cross-examine witnesses.

Specifically, Nava argues the trial court erred in excluding evidence of (1) four accusations of molestation "against other people by other family members" of the victim's family; (2) Nava's statement to Schulman that he maintained a certain distance from the victim because she gets angry and makes accusations, like accusing her neighbor, a young man, of "touch[ing] her butt," and that Nava told the victim's mother to watch over the victim closely; (3) "bad blood" between Nava and the victim's mother; and (4) molestation of the victim's older sister by Nava's "brother, Silvano B."[5] We agree with the People that Nava forfeited most of his claims by failing to seek appropriate evidentiary rulings, and, to the extent his claims have been preserved for appellate review, he has failed to demonstrate an abuse of discretion by the trial court.

### *Standard of Review*

A trial court's rulings on the admissibility of evidence, including under section 352, are reviewed for abuse of discretion. (*People v. Scott* (2011) 52 Cal.4th 452, 490-491 (*Scott*).) We will not set aside a judgment by reason of the erroneous exclusion of evidence unless the error resulted in a miscarriage of justice. (§ 354.) An error has resulted in a miscarriage of justice and warrants reversal "if in the absence of the error, the appealing party would have probably obtained a more favorable result. (See Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; Evid. Code, § 354; [citations].)" (*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 526-527.)

"'As a general matter, the "[a]pplication of the ordinary rules of evidence … does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' [Citation.]" (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) Where the trial court

---

[5]Nava's fourth claim of evidentiary error refers to evidence that Nava's brother-in-law (not his brother) Silvano B. was charged in 1999 with molesting the victim's older sister and the charges later were dropped. This is discussed in Nava's petition for writ of habeas corpus filed approximately nine months after the appeal. (See part VII. of the DISCUSSION, *post*.)

14.

does not preclude the defendant from presenting a defense but rejects some evidence concerning that defense, the error is reversible only if it has resulted in a miscarriage of justice. (*Ibid.*)

With certain statutory exceptions, all relevant evidence is admissible. (§ 351.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness …, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) The test is whether the evidence tends "'''''''logically, naturally, and by reasonable inference" to establish material facts .… [Citations.]' [Citation.]''''''' (*People v. Fields* (2009) 175 Cal.App.4th 1001, 1016.) Circumstantial evidence is evidence from which a fact may be inferred. (*People v. Nealy* (1991) 228 Cal.App.3d 447, 451.) "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (§ 600, subd. (b).) The trial court has broad discretion to determine whether evidence, including circumstantial evidence, is relevant. (*Scott*, *supra*, 52 Cal.4th at p. 490; *People v. Harris* (2005) 37 Cal.4th 310, 337-338.) However, even relevant evidence may be excluded if its probative value is substantially outweighed by concerns of undue prejudice. (§ 352.)

"Generally, in order to preserve any evidentiary point for appellate review, the proponent of the evidence must make an offer of proof regarding the anticipated testimony or ask questions which presage the expected response. [Citations.] Failure to make an adequate offer of proof precludes consideration of the alleged error on appeal. [Citation.]" (*People v. Eid* (1994) 31 Cal.App.4th 114, 126.) "An offer of proof should give the trial court an opportunity to change or clarify its ruling and in the event of appeal would provide the reviewing court with the means of determining error and assessing prejudice. [Citation.] To accomplish these purposes an offer of proof must be specific. It must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued. [Citations.]" (*People v. Schmies* (1996) 44 Cal.App.4th 38, 53

15.

(*Schmies*).) "An offer of proof must consist of material that is admissible, it must be specific in indicating the purpose of the testimony, the name of the witness and the content of the answer to be elicited." (*Semsch v. Henry Mayo Newhall Memorial Hospital* (1985) 171 Cal.App.3d 162, 167.)

### Four Accusations of Molestation by Members of the Victim's Family

Nava's failure to make a specific offer of proof forfeited his claim that the trial court erred in excluding evidence of four accusations of molestation by members of the victim's family against other people.

To counter the forfeiture argument, Nava correctly points out the prosecution preemptively sought to exclude such evidence in one of its in limine motions. When the prosecution asked the court to rule on the motion, however, defense counsel stated, "I think I can probably shortcut that because I recognize that I don't have—although I've shared with the prosecutor the names of people and some other incidents, I don't have any [of] these people available to testify." When the issue arose during trial, defense counsel again indicated he was not planning to go into the area of the four prior accusations of molestation.

Thereafter, the trial court indicated it agreed with the prosecutor's argument that such evidence was irrelevant and unduly prejudicial as its only apparent purpose was to show that "this victim's family is out to just accuse people." Defense counsel did not object to this characterization of the evidence or attempt to make a showing that the evidence was relevant to any of the issues at trial.

In the absence of a specific offer of proof, the trial court acted well within its discretion in excluding the evidence as irrelevant.

### Nava's Statement to Schulman

Nava has similarly forfeited his claim concerning the exclusion of his statement he made during his interview with Schulman regarding the victim's claim that a young man in the neighborhood "touch[ed] her butt."

16.

Nava argues the evidence was relevant because "it shows that [the victim] was familiar with sexual touching and had a basis and experience upon which to fabricate testimony." (See *People v. Daggett* (1990) 225 Cal.App.3d 751, 757.) Nava, however, did not offer the evidence on this ground in the trial court. Rather, it was the prosecutor who brought the evidence of Nava's statement to the court's attention and pointed out she did not see how it was relevant.[6] In response, defense counsel stated he thought the evidence had "some probative value" because Nava's statement was given in response to the deputy's question asking Nava why a 10-year-old girl would lie, which "tends to be a major question in a case like this."

The trial court deferred a ruling on the admissibility of the statement but indicated it disagreed with counsel's relevancy argument, pointing out that for Nava to say "she's accused other people, she may have been molested before" did not really answer the deputy's question of why the victim would lie in this instance. It does not appear the court thereafter made a specific evidentiary ruling regarding Nava's statement to Schulman.

On the merits, assuming the trial court's statements can be interpreted as a ruling to exclude Nava's statement to Schulman, Nava has not demonstrated the trial court abused its discretion in excluding this evidence as irrelevant. Nava exaggerates his proffered statement by suggesting it established the victim had been sexually molested in

---

[6]The prosecutor read the relevant portion of the interview transcript as follows: "[Schulman:] 'Why would a ten-year-old girl make an accusation against you? Who's the family member if you did not do it?' [¶] The defendant: 'I'm going to tell you. When that little girl gets angry she says a lot of things from her house. She has said a lot of things and she has talked to—talked to about another young man who lives next to the house, that the young man would touch her—her butt area. And I told my sister, take care of that little girl because they want to touch her, and she did not listen. But for me to touch someone, no one.'"

17.

the past.  Nava merely reported that the victim claimed a young man touched her "butt area."  His statement disclosed nothing about the circumstances or the extent of the alleged touching.  The minimal information presented by Nava's statement, which may very well have been the extent of any possible testimony on the subject, was very different than the allegations the victim made against Nava of squeezing her breasts and vagina underneath her clothes.  Because the jury would have to speculate to reach the conclusions asserted by Nava, the evidence was properly excluded.

### *Bad Blood between Nava and the Victim's Mother*

During Nava's direct examination defense counsel asked, "[W]as one of your sisters angry at you before this accusation came out?"  The prosecutor objected on relevancy grounds, and the trial court called for the jurors to take a break.

Outside the presence of the jury, the trial court noted that it looked like defense counsel was "going to go into an area where—to establish some sort of bad blood between the victim's mother and the defendant; is that correct?"  Defense counsel responded, "I understood there was some bad blood between him and his sister … and she'd come in and said there was none."  The court asked what the relevance was and defense counsel stated:  "Well, what if the mother has—is encouraging the daughter to lie about this?  That's the relevance."  The trial court replied:

> "There's no evidence that if there was—assuming for the purpose of this discussion that there was bad blood between … the victim's mother and the defendant, unless the victim knew about these problems, this conflict, then it's not relevant.  And there's no evidence of any coaching or anything like that.  So this area is not relevant.  It's—it is prejudicial and it's undue consumption of time."

In response, defense counsel stated:  "Well, to save time, I'm not going to disagree with you.  I mean I disagree with you, but I'm not going to try to go into that area any further because what I'm really fishing for is why would [the victim] say this if it wasn't true."

18.

Nava argues that because the victim was only 10 years old at the time of the alleged molestation, we should infer that the victim's mother likely was the person who instigated the criminal investigation. Therefore, evidence of the mother's bias against Nava was relevant and should have been admitted. (See *People v. Haxby* (1962) 204 Cal.App.2d 791, 792, 795-796 [trial court erred in refusing to allow defense counsel to show hostile relationship existed between defendant and his next-door neighbors, who instigated investigation of defendant's conduct that led to his conviction of committing lewd acts on his daughter and a neighbor girl].) But there was no evidence here the victim's mother instigated the investigation into Nava's conduct. Rather, there was evidence to the contrary in that the victim's mother testified she was planning to call the police, but they came to her house before she had a chance to call them.

We do not think the trial court abused its discretion in excluding the evidence. The evidence had minimal probative value. As the court noted, even assuming there was some kind of bad blood or hostility between Nava and the victim's mother, it did not tend to prove the victim lied about Nava molesting her, absent evidence the victim was aware of the hostility or that her mother influenced her somehow in making her allegation against Nava.

### Victim's Older Sister Was Molested

Nava contends the trial court erred in excluding as irrelevant evidence that the victim's older sister was molested by Nava's brother because this was "direct evidence of a potential bias between not only the families, but also [the victim], if she had been informed of the conduct." We disagree.

Like the alleged bad blood between Nava and the victim's mother, evidence the victim's family was biased against Nava, based on his brother's alleged molestation of the victim's older sister, was irrelevant. There was no evidence the victim was aware of the molestation or that the victim's family somehow influenced the victim in bringing her

19.

accusation against Nava. Nor was there any evidence the victim's family instigated the criminal investigation against Nava. The trial court did not err.

### *Constitutional Challenge*

Nava forfeited his constitutional challenge by failing to raise in the trial court his claim that the exclusion of the evidence violated his constitutional rights to present a defense and confront witnesses.

## IV. Admission of Victim's Hearsay Statement

Nava claims the trial court erred when it admitted, over his hearsay objection, Schulman's testimony that the victim said she was crying because "she was afraid to be in the room with [him], as an older male, because of what her uncle had done to her." After holding a sidebar conference, the trial court allowed the evidence to be admitted under the exception to the hearsay rule contained in section 1360.

Nava now contends section 1360 was inapplicable because the victim's statement to Schulman was not "describing any act of child abuse … or describing any attempted act of child abuse …." (§ 1360, subd. (a).) The rationale used by the trial court for admitting the evidence, however, is not a matter for this court's review. (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329.) It is judicial action and not judicial reasoning that is the proper subject of appellate review. (*El Centro Grain Co. v. Bank of Italy, etc.* (1932) 123 Cal.App. 564, 567.)

As the victim's statement was admissible under at least one exception to the hearsay rule, the trial court's admission of the evidence must be upheld. (*People v. Brown* (2004) 33 Cal.4th 892, 901 ["If a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below"].)

Section 1250 permits admission of "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) … when: [¶] (1) The

20.

evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (*Id.,* subd. (a).) ""'[A] victim's out-of-court statements of fear of an accused are admissible under section 1250 only when the victim's conduct in conformity with that fear is in dispute. Absent such dispute, the statements are irrelevant. [Citations.]"' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 819 (*Jablonski*).)

Nava placed the victim's state of mind at issue. He asserted the victim fabricated her claims of molestation against him as a means of gaining attention. He also maintained her conduct in laughing and smiling when describing the molestation was inconsistent with the behavior one would expect to see in a sexual abuse victim who feared her abuser or was traumatized as a result of the abuse. (*Jablonski*, *supra*, 37 Cal.4th at p. 820 [victim's fear of accused may be relevant where, according to defendant, victim behaved in manner inconsistent with that fear].)[7]

Evidence that the victim cried and said she feared being in the room with Schulman, as an older man, after what her uncle did to her, implicitly expressed the victim's fear of Nava. It was relevant to dispute the defense theory that her behavior was

_____

[7]For example, defense counsel argued: "Did you notice that [the victim] was depressed or quiet? Common sense tells us that's what would happen if somebody's traumatized or victimized like she said. But instead, you see the exact opposite. You see the laughing and smiling and in an effort to short that up, they try to bring up, well, she cried once during the interview and said she was afraid. I think the candid capture of this young girl on the video [of her interview with social services practitioner Acosta-Perez] is more revealing of what's going on with her. She likes this moment. She's finally getting what she wants. She's getting more attention from her mom who has left her with this family. She's getting the attention she finally wants. She's getting attention from the lady on the video. She loves it. She basks in it." A little later defense counsel argued: "So does it matter that her story's consistent or does it matter that her behavior is inconsistent with the story? There are things that don't fit."

21.

inconsistent with someone who had been sexually abused and indicated she fabricated her accusations because she wanted (and enjoyed) the resulting attention. As Schulman's testimony was admissible under section 1250, the trial court did not err in allowing it.

## V. Prosecutorial Misconduct

Nava argues the prosecutor committed misconduct by using, in cross-examination and closing argument, "reprehensible and deceptive means" to portray Nava "as an extraordinarily arrogant man with a family of criminals." We disagree.

During cross-examination, the prosecutor questioned Nava about his interview with Schulman, in relevant part, as follows:

> "Q. Okay. And then when you told the officer that your son, who you went to go visit in prison, was being falsely imprisoned, you told the officer that people lied there and that's why he was being falsely imprisoned?
>
> "[DEFENSE COUNSEL]: Objection, irrelevant.
>
> "THE COURT: Sustained.
>
> "[DEFENSE COUNSEL]: Move to strike.
>
> "THE COURT: Stricken.
>
> "[DEFENSE COUNSEL]: The question and the answer.
>
> "[THE PROSECTUOR]:
>
> "Q. Is your son in prison? [¶] … [¶]
>
> "[DEFENDANT]: Yes.
>
> "[THE PROSECUTOR]: Is he being illegally incarcerated, in your opinion?
>
> "[DEFENSE COUNSEL]: Objection irrelevant.
>
> "THE COURT: Sustained. Sustained. You don't answer that, sir. Don't answer that. [¶] Go ahead.
>
> "[THE PROSECUTOR]:

22.

"Q. Is it always somebody else's fault, Mr. Nava?

"[DEFENSE COUNSEL]: Objection, argumentative.

"THE COURT: Sustained."

In closing argument, the prosecutor stated:

"Another one of his responses was asked about making mistakes. This is an arrogant man, that's what the defendant is. And when asked if you ever have made a mistake, his response is, no, he's never made a mistake. And talking the deputy, what about a traffic accident? [*Sic.*] Well, yeah, but it wasn't my fault. It's all somebody else's fault with this defendant. It's never his fault."

No objection was made to these statements.

""""The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"' [Citation.]" [Citation.]' [Citation.] [¶] Regarding the scope of permissible prosecutorial argument, ""'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness'" [citation], and he may "use appropriate epithets …."'" [Citation.]' [Citation.] [¶] Finally, 'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an

23.

assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 951-952.)

Any claim of prosecutorial misconduct has been forfeited because Nava did not object on that basis and did not request the jury be admonished to disregard any impropriety. Nava concedes no objection on the ground of prosecutorial misconduct or request for admonishment was made in the trial court but contends the issue is reviewable on appeal because an admonishment would not have cured the harm. He fails, however, to provide a meaningful explanation to support this contention. He simply asserts the challenged cross-examination questions were "so argumentative in nature and so aimed at developing an irrelevant character attack of [him] and his family that an admonition would not have cured the harm."

Merely asserting that the misconduct is "incurable" is insufficient. (*People v. Foster* (2010) 50 Cal.4th 1301, 1354 [California Supreme Court rejected defendant's assertion he did not forfeit claim of prosecutorial misconduct by his failure to object and seek curative admonition where defendant did not explain why a curative admonition would not have cured any harm].) The circumstance of Nava's son being in prison was already before the jury through defense evidence that Nava was visiting him there at the time the victim claimed she was molested. Therefore, the prosecutor's referring to Nava's son being in prison did not render the questions incurably inflammatory. We see no support in the record for Nava's suggestion that the questions were aimed at showing he had "a family of criminals" or a son who was "a serious criminal."

Regardless, even assuming Nava preserved his claim of prosecutorial misconduct for appellate review, it fails on the merits for two reasons. First, there is no indication the jury construed or applied the prosecutor's cross-examination questions in a manner contrary to the trial court's instructions. The court sustained defense counsel's objections to the complained-of questions on the grounds they were irrelevant and argumentative.

24.

The court also granted defense counsel's motion to strike the prosecutor's question asking Nava whether he told Schulman his son was falsely imprisoned and that his son was in prison because people had lied.

A jury is presumed to follow a court's instruction in the absence of any indication that it was unwilling or unable to do so. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.) The jurors were instructed:

> "During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law. If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did. If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose."

Here, there is no evidence in the record, and Nava has cited none, indicating the jury was unwilling or unable to follow these instructions.

Second, it is clear the challenged remarks in closing argument were not objectionable. The prosecutor's argument did not, as Nava suggests, refer back to the prosecutor's objectionable questions during cross-examination. Rather, the prosecutor's argument refers to questions preceding those. In cross-examination, Nava acknowledged he told Schulman he never made any mistakes, testifying, "No, I have never made mistakes." Nava also acknowledged denying he was at fault when Schulman challenged his assertion about never making mistakes by observing Nava had hit someone in a car accident. Thus, Nava testified, "Yes, but it's never been my fault. Never."

In light of Nava's testimony professing never to make any mistakes, the prosecutor's remark that Nava was an arrogant man constituted fair comment on the evidence and did not amount to misconduct. Even if we were to view the prosecutor's remarks as improper, the jurors were instructed that comments from counsel were not evidence and they were to decide the case based upon the evidence, not bias, sympathy,

prejudice, or public opinion. Again, we see no evidence in the record that the jurors were unable or unwilling to follow these instructions.

## VI. Exclusion of Character Evidence

Nava contends the trial court erred in excluding evidence of "specific instances of good conduct around young girls" to rebut the prosecution's section 1108 evidence. We agree with the People that Nava's failure to make a specific offer of proof regarding such evidence forfeited his claim on appeal.

To avoid forfeiture Nava argues it would have been futile for him to make a specific offer of proof because the trial court made a "blanket ruling" excluding evidence of specific instances of good conduct. (§ 354, subd. (b); see *Schmies*, *supra*, 44 Cal.App.4th at p. 54, fn. 9.) Nava is correct that "[w]here an entire class of evidence has been declared inadmissible or the trial court has clearly intimated it will receive no evidence of a particular class or upon a particular issue, an offer of proof is not a prerequisite to raising the question on appeal, and an offer, if made, may be broad and general. [Citations.]" (*Beneficial etc. Ins. Co. v. Kurt Hitke & Co.* (1956) 46 Cal.2d 517, 522.) "An offer [or a more specific offer] under those circumstances would be an idle gesture." (*Caminetti v. Pacific Mut. Life Ins. Co.* (1943) 23 Cal.2d 94, 100.) Such circumstances did not exist here.

Nava failed to make an offer of proof before there was any indication by the trial court that a specific offer of proof would be futile. Instead, defense counsel expressly indicated he was *not* planning to introduce evidence of specific instances of good conduct and thus made no offer of proof before the trial court made its so-called blanket ruling to exclude such evidence.

Moreover, throughout the trial, the trial court showed itself to be willing to revisit evidentiary issues addressed during the pretrial hearing based on evidence that had been presented. There is no indication the trial court would not have given meaningful

consideration to a specific offer of proof if counsel had come to view evidence of specific instances of good conduct as relevant to refute the prosecution's section 1108 evidence.

## VII. Ineffective Assistance of Counsel

Nava has filed a separate petition for writ of habeas corpus claiming his defense counsel rendered ineffective assistance at trial by (1) failing to obtain prison records corroborating his alibi defense; (2) neglecting to present good character evidence to rebut the prosecution's section 1108 evidence; and (3) not making a specific relevance proffer about a prior accusation of molestation by the victim's sister against his brother-in-law.[8]

### *Standard of Review*

The defendant has the burden of proving ineffective assistance of trial counsel. To prevail on a claim of ineffective assistance of trial counsel, the defendant must establish not only deficient performance, which is performance below an objective standard of reasonableness, but also prejudice. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Tactical errors generally are not deemed reversible. (*People v. Maury* (2003) 30 Cal.4th 342, 389 *(Maury)*.)

Counsel's decisionmaking is evaluated in the context of the available facts. To the extent the record fails to disclose why counsel acted or failed to act in the manner challenged, appellate courts will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or, unless there simply could be no satisfactory explanation. (*Maury, supra,* 30 Cal.4th at p. 389.)

Prejudice must be affirmatively proved. The record must affirmatively demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Maury, supra,* 30 Cal.4th at p. 389.)

---

[8]By order filed June 5, 2014, we consolidated the appeal with the writ petition.

27.

Attorneys are not expected to engage in tactics or to file motions that are futile. (*Id.* at p. 390; see also *People v. Mendoza* (2000) 24 Cal.4th 130, 166.)

*Analysis*

Nava's contention fails for three reasons. First, he contends defense counsel rendered ineffective assistance by failing to obtain "easily obtainable" prison visitation records reflecting Nava and his wife visited their son at the prison in Tehachapi at 7:35 a.m. on Saturday, July 23, 2011, thereby corroborating Nava's alibi defense.

The record, however, discloses a reasonable explanation for counsel's alleged omission. In a letter responding to questions posed by Nava's retained appellate counsel, defense counsel explained he verified the prison visit with Nava, Nava's wife, and Jesse. "The victim however testified that this happened early before he departed to visit the son." Defense counsel further noted Nava's wife "could have been a good witness but had an emotional meltdown suddenly just before I wanted to call her to the stand and had to be taken to the hospital. Later at sentencing she was back to normal."

On cross-examination, defense counsel elicited testimony from the victim that, to the best of her recollection, the molestation occurred early in the morning on Saturday, July 23, 2011, after Jesse woke her up to get milk from the refrigerator in the garage. Defense counsel's clarification of the timing of the alleged incident demonstrates why presenting further corroborating evidence of Nava's alibi would not have been particularly helpful to the defense and therefore counsel was not deficient for failing to develop it. The prosecution did not dispute that Nava and his wife visited their son in prison but posited the theory that if the molestation occurred Saturday morning as the victim recalled, then it must have occurred before Nava and his wife left to visit their son.[9]

---

[9]For example, the prosecutor argued: "We heard that the defendant left at 4:00 a.m. If Jesse's got a baby in that house that early in the morning, doesn't it make sense that she asked for milk? Doesn't it make sense [the victim] was already up?... So if the

28.

These circumstances also demonstrate the absence of prejudice. As the prosecution did not dispute the prison trip occurred, Nava's theory that the jury in this case would have expected him to present prison records to prove the trip and likely rejected his alibi defense based on his failure to do so fails.

Second, Nava complains defense counsel was ineffective because "[d]espite being provided over 35 character letters, trial counsel did not request testimony from any number of young girls that were ready and willing to testify that either on family vacations, overnights, or dance rehearsals, despite being alone with [Nava], they were always treated with respect."

Again, the record reveals a satisfactory explanation for counsel's alleged omission. In his letter to Nava's appellate counsel, defense counsel explained that "[f]rom a tactical standpoint given the nature of the charges, where it happened, and his active involvement in cultural dancing with young girls I did not feel that would help." In a case alleging the molestation of a young girl, it was not unreasonable for counsel to decide not to seek the admission of evidence calling the jury's attention to Nava's taking an interest in and participating in numerous activities bringing him in close proximity to young girls.

Nava also claims defense counsel failed to call Arcelia Valdez as a character witness. She provided a declaration in which she described her long acquaintance and frequent contact with Nava. The record, however, does not disclose whether defense counsel even was aware of this witness.

Finally, Nava contends defense counsel was ineffective for failing to investigate charges that were brought, and then later dropped, against Nava's brother-in-law, Silvano B., for committing lewd acts on the victim's sister in 1999.

---

defendant's up at 4:00 a.m. getting ready [to] go to Tehachapi to see his son in prison, then [the victim] was awake. So you can believe it happened Saturday morning because they were both there. There's an opportunity there. Both there, they're both awake, they're moving around the house …."

29.

Nava asserts that "evidence that there was a prior fabricated charge, or that there was an actual molestation, would both have been highly relevant" to his defense. This is so, he argues, because if the victim's mother "encouraged her older daughter to lie, this would have significantly called into question her credibility." On the other hand, if his brother-in-law molested the victim's sister, this evidence would be relevant to show that the victim "was familiar with certain forms of sexual assault, since her older sister had experienced what, judging by the complaint, appears to be a similar type of sexual assault at a similar age."

This last claim of ineffective assistance of counsel fails because Nava cannot establish prejudice. His relevancy arguments are based entirely on speculation. They assume the victim's mother either encouraged the victim to lie or the victim was familiar with the acts of sexual abuse allegedly inflicted on her sister over a decade before the alleged conduct in this case. Nava presents no evidence in his writ petition, and no evidence was presented at trial, suggesting the victim's mother encouraged or coached the victim to fabricate her allegations against Nava, or that the victim was familiar with any prior allegations of sexual abuse against the victim's sister. Thus, Nava has failed to establish that investigation into charges of sexual abuse by his brother-in-law against the victim's sister would have yielded relevant evidence affecting the outcome of the proceedings.

30.

**DISPOSITION**

The judgment is affirmed.  The petition for a writ of habeas corpus is denied.

_____
CORNELL, Acting P.J.


WE CONCUR:


_____
DETJEN, J.


_____
FRANSON, J.